The judgment of the district court will be reversed and the cause remanded for a new trial.

**Esther MARION, Guardian of James E. Marion, Incompetent, Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Appellee.**

**No. 18163.**

United States Court of Appeals
Eighth Circuit.

May 2, 1966.

176

John W. Walbran, of Thompson, Walther & Shewmaker, St. Louis, Mo., for appellant. Mary P. Walbran, of Walbran & Walbran, Owatonna, Minn., was with him on the brief.

Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn., for appellee. Miles W. Lord, U. S. Atty., Minneapolis, Minn., was with him on the brief.

Before VOGEL, Chief Judge, BLACKMUN, Circuit Judge, and STEPHENSON, District Judge.

BLACKMUN, Circuit Judge.

On November 28, 1962, the appellant-guardian applied for disability insurance benefits for her ward, whom we shall hereinafter call the applicant, under § 223, as amended, of the Social Security Act, 42 U.S.C. § 423. A hearing was granted but the application was denied administratively. The district court, on review pursuant to 42 U.S.C. § 405(g), has upheld the Secretary's action and entered judgment in his favor.

The applicant-ward was born September 4, 1932, and is now 33 years of age. He is a homosexual with his deviance directed toward young boys. He stands committed indefinitely under the Minnesota Psychopathic Personality Act, Minn. Stat.Ann. § 526.09–526.11 (1947). He possesses, however, the required quarters of coverage. His case therefore focuses solely on his claimed disability within the statutory standard. We are advised by counsel that the matter may be one of first impression.

At the time the application was filed § 423(c) (2) defined disability as follows:

"The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."[1]

There is no dispute about the facts. Because they are important we review them in some detail.

The application recited that the ward was impaired by reason of "mental disorder"; that he became unable to work because of this impairment on June 4, 1962; that he was confined in the Saint Peter ( Minnesota) State Hospital; and that he had worked as a salesman in a men's clothing store. The eventual hearing before the examiner produced the following:

The applicant is the oldest of three children. His home is in Owatonna, Minnesota. He graduated in 1951 from a military academy-high school in that city. He then entered school in Florida but was soon sent home because of a molestation incident there. He joined the air force in 1952 but was discharged because of his concealment of the Florida episode. He attended a Minneapolis business college for a few months. In 1954 he was picked up by the Minneapolis police due to a suspected attempt to molest and was admitted to the University of Minnesota Hospital.

After this incident the applicant returned to Owatonna and was employed in his father's men's clothing store there. In 1955 the probate court of Rice County, Minnesota, found him to be mentally ill and committed him to the State Hospital at Rochester. He was confined about a year. He returned home and worked at the store again. In 1956 he found employment in a Saint Paul department store. He ran into difficulty there on a theft charge. He came back to the Rochester Hospital for another year. In 1957 he returned to his home in Owatonna. He was at Rochester again in June 1962.

The guardian testified that she was the mother of the applicant; that Dr. J. S. Lewis, who had examined the applicant when he was at the University Hospital in 1954, told her that her son had scar tissue in the brain caused by a childhood injury; that this restrained his sexual development at an age 13 level; that when the applicant was employed in the store at Owatonna he became very nervous; that in 1955 he was arrested in Faribault on a sex charge; that after this the probate court found him to be mentally ill; that his theft charge difficulty in 1956 was due to "trying to keep up with the crowd"; and that in her opinion the applicant was mentally ill, could not work in a community such as Owatonna, was not employable in the open market, and could work only under very close supervision.

The applicant's father testified that the applicant had worked for him on and off since he was out of high school; that he observed the buildup of nervous tension; that this interfered with his son's ability to sell; that, however, he was a good salesman; that he felt he was mentally ill; and that he was in difficulty with the police because of something other than sexual deviation on only the one occasion.

---

1. This statute was amended July 30, 1965, by § 303(a) (2) of Pub.L. 89–97, 79 Stat. 367. The amendment changed the final clause, directed to the duration aspect of the disability, by making it read, "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; or * * *" The prior form governs eligibility and benefits for the period before September 1965. § 303 (f) (1) of Pub.L. 89–97. The new form governs subsequent eligibility and benefits. The parties appear to acknowledge that the facts of the present case are such that the amendment has no effect upon the merits; the issue of disability remains the same under either definition.

The record contains a number of medical reports:

1. A report from the Mayo Clinic at Rochester, Minnesota, states that the applicant was seen there in August 1940 with a history of two falls shortly before that time with headaches and vomiting. An X-ray from home disclosed a possible skull fracture. He was dehydrated and drowsy. He was hospitalized for six days and gradually improved.

2. The report from Dr. J. S. Lewis at the University had to do with his examination of the applicant in August 1954. At that time the physical, routine laboratory, and neurological examinations were normal. Psychometric studies "revealed the patient to be quite disturbed but did not reveal a definite diagnosis". The doctor stated that it "is difficult to conjecture the etiological development of this patient's bizarre fantasies and poor impulse control. There are no similar situations in the patient's family and it is difficult to determine an environmental factor contributing to his difficulty". The diagnosis was "Sociopathic personality disturbance, antisocial type". The prognosis was "Guarded and it is entirely possible that under stressful conditions * * * the boy will eventually regress to psychosis and will need further hospitalization". The patient was discharged home "to receive further Out-Patient supportive psychotherapy as needed".

3. The applicant's return to the Rochester State Hospital in June 1962 was on a hold order from Steele County, Minnesota, occasioned by continued indications of sexual deviation. The diagnosis at Rochester was "Sociopathic Personality Disturbance, Sexual Deviation". It was stated that the applicant "did not control his impulses even while a patient in this hospital", that it was "quite possible" that, if frightened, he may physically hurt a child, and that "This man should not be readmitted in an open situation, but at least at this time requires maximum supervision". The psychologist's examination indicated average to high average intelligence and disclosed normal limits on the MMPI; he concluded that the examination "does not reflect a mental or emotional disorder of [a] kind of magnitude which could be considered a necessary or sufficient cause of his allegedly sexually deviant behavior", and "It is felt that he does not present treatable psychopathology, but rather * * * a broadly defined character disorder", and a "social-moral rather than a medical-treatment problem", where the best hope for control "probably lies in a judicial rather than psychiatric disposition of his case."

4. The Steele County, Minnesota, probate records contain the findings of a board (the probate judge and "two duly licensed doctors of medicine", M.S.A. § 526.10), who examined the applicant in August 1962, and of the Probate Court itself. This notes the applicant's attraction to young boys, the molestation incidents, and his being a patient at the Rochester State Hospital, and makes a determination that he is a psychopathic personality and that his commitment "is necessary for the welfare and protection of the patient and society". He was thereupon committed to the Saint Peter State Hospital under the Minnesota Psychopathic Personality Act.

5. The admission report at Saint Peter, prepared August 30, 1962, describes the applicant as "a clear thinker, forceful, fabricates", with good intellect and memory orientation and no evident organic disease. It refers to his receiving psychiatric care for his molestation problem for approximately ten years. No fears, delusions or obsessions were observed. The psychologist's accompanying report notes that the applicant was well oriented, of neat appearance and of average intelligence. "This is a hypomanic individual who does not appear psychotic at this time. * * * This kind of personality pattern suggests the likelihood of an enduring pattern unlikely to be changed much by psychotherapeutic techniques. Nevertheless, it is quite probable that this individual can be successfully rehabilitated provided he finds himself vocationally".

6. In March 1964 the consulting psychiatrist at the Saint Peter Hospital wrote the hearing examiner:

"Mr. Marion was admitted to this institution on August 29, 1962. Established diagnosis is 52.20 Sociopathic Personality—Sex Deviation. According to the Standard APA Classification this person would not be considered to have a psychoneurosis or a psychosis.

"Your letter was discussed with the patient. We are entertaining the possibility of attempting transfer to an open state hospital setting. The patient would like to acquire some funds to finance vocational training after hospital release. It would be our suggestion that at a later date, referral to vocational rehabilitation be entertained with a goal of getting help for the patient in a training program."

Elbert B. Donahue was called by the hearing examiner as a vocational expert. Dr. Donahue possesses a degree of Doctor of Education, is a college professor and director of counselor training, and has done post-doctoral study in psychology. He testified that in his opinion, although he had not seen the applicant, "the evidence would indicate that [the applicant] does not have a psychosis" or a psychoneurosis or any brain damage; that homosexuals experience trouble getting jobs in the common labor market if their tendency is known; that it would depend on the type of job; that "It would certainly have to be considered"; that homosexuals are employed; that they may or may not have normal skills and intelligence; that the physical evidence disclosed nothing which indicated the applicant could not work; that the skills of a clothing salesman could be transferred to other sales lines; that "Get-

ting the job, if the employer had all [the] evidence that we have, might be difficult"; that he knew of nothing in the nature of sheltered employment for the applicant; that there are four to five million of the general adult population who have homosexual tendencies; that homosexuality does not particularly tax one's emotional or rational faculties; that he felt the claimant could sell successfully; that his record will be a handicap; that there are many people with records who have been accepted by industry; that he did not believe there had been a regression in the applicant; that efforts should be made to keep him from situations where he would be dealing with boys; that there are many positions he could perform adequately where he would not be working with young people; and that "I wouldn't want him to come in contact with my young people".

The hearing examiner based his conclusion that the applicant was not entitled to disability benefits primarily upon the social security regulation having to do with personality disorders. This is 20 C.F.R. § 404.1519(c) (2) (iii), 42 U.S.C.A. Appendix p. 494.[2] The examiner ruled that the applicant fell into this category; that his disorder was not associated with a severe psychoneurosis or psychosis; and that he had no other impairment which would preclude any substantial gainful activity if he were not confined.

This court in recent opinions has held that an applicant has the burden of establishing his claim; that the Social Security Act is remedial and is to be construed liberally; that the Secretary's fact findings and the reasonable inferences to be drawn from them are conclusive if they are supported by substantial evi-

---

2. "Personality disorders. Personality disorders are characterized by patterns of socially unacceptable behavior, such as chronic alcoholism, sexual deviation and drug addiction. In the absence of an associated severe psychoneurosis or psychosis, a personality disorder does not in itself result in inability to engage in

substantial gainful activity. A person confined in a correctional institution because of antisocial behavior will not be considered disabled unless he has other severe impairments which would preclude any substantial gainful activity if he had not been so confined."

dence, 42 U.S.C. § 405(g); that substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; that the determination of the presence of substantial evidence is to be made on a case to case basis and on the record as a whole; that where the evidence is in conflict or subject to conflicting inferences it is for the Appeals Council, on behalf of the Secretary, to resolve those conflicts; that the statutory definition of disability imposes the threefold requirement (a) that there be a medically determinable physical or mental impairment of the type specified by the statute, (b) that there be an inability to engage in any substantial gainful activity, and (c) that the inability be by reason of the impairment; that substantial gainful activity is that which is both substantial and gainful and within the claimant's capability, realistically judged by his education, training and experience; and that the emphasis is on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable or theoretical. Celebrezze v. Bolas, 316 F.2d 498, 500–501 (8 Cir. 1963); Celebrezze v. Sutton, 338 F.2d 417, 418 (8 Cir. 1964); Brasher v. Celebrezze, 340 F.2d 413, 414 (8 Cir. 1965).

The Minnesota Psychopathic Personality Act (Chapter 369 of the Session Laws for 1939) defines "psychopathic personality":

"The term 'psychopathic personality,' as used in sections 526.09 to 526.11, means the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of his acts, or a combination of any such conditions, as to render such person irresponsible for his conduct with respect to sexual matters and thereby dangerous to other persons." M.S.A. § 526.09.

It further provides:

"Except as otherwise provided, all laws now in force or hereafter enacted relating to insane persons, to persons alleged to be insane, and to persons found to be insane, shall apply with like force and effect to persons having a psychopathic personality, to persons alleged to have such personality, and to persons found to have such personality, respectively. * * *" M.S.A. § 526.-10.

The psychopathic personality condition, however, in itself is not a defense to a charge of crime and does not relieve one from trial upon a criminal charge. M.S.A. § 526.11.

Promptly upon the Act's passage it was challenged on constitutional grounds. The Supreme Court of Minnesota upheld the statute. State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N.W. 297 (1939). The court emphasized the Act's incorporating by reference all state laws relating to insane persons and said, pp. 302–303 of 287 N.W.:

"[I]t can reasonably be said that the language of Section 1 of the act [M.S. A. 526.09, quoted above] is intended to include those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire. It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. * * * The act before us, in providing for the care and commitment of persons having uncontrollable and insane impulses to commit sexual offenses, treats them as insane."

This decision was affirmed on appeal to the Supreme Court of the United States. Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L. Ed. 744 (1940).

In Dittrich v. Brown County, 215 Minn. 234, 9 N.W.2d 510, 512 (1943), the Minnesota court observed that before one may be adjudged a psychopathic personality

under the Act two facts must be established, namely, that he is irresponsible with respect to sexual matters and that, because of this, he is dangerous to others. The Minnesota Attorney General in formal opinions has recognized this factor of danger to others and the application of the laws relating to the dangerously insane. O.A.G. (1942) No. 27, p. 60; O.A.G. (1940) No. 32, p. 60.

With all this background in mind we look again at the specific language of the federal statute. We find nothing there, beyond the threefold requirement, which is otherwise restrictive. We find nothing which separates the psychoses and the psychoneuroses from other types of impairment. And we would be reluctant, indeed, to pivot a conclusion upon a currently accepted—but subject to change— definition of a particular psychiatric term or phrase. See the startling and almost frightening example of the danger of this kind of legal indulgence deplored in Judge Burger's concurring opinion in Blocker v. United States, 110 U.S. App.D.C. 41, 288 F.2d 853, 857, 860–861 (1961).

We cannot escape the conviction that this applicant, despite the apparent absence of any impairment other than his deviant tendencies, meets the disability requirement of the statute. He is committed under a state law which the Supreme Court of Minnesota describes as applicable to those persons who "have evidenced an utter lack of power to control their sexual impulses", and who, as a consequence, are likely to be dangerous to others, and a law which, that court says, "treats them as insane". He is committed by a probate court order based upon findings that he is a psychopathic personality and that his commitment is necessary for his and society's welfare and protection.

■ We have no hesitancy or difficulty in relating this applicant's predicament to the threefold requirement of the federal statute. Certainly one cannot persuasively argue that he does not suffer from physical or mental impairment when he has been long confined under a state statute which treats him as insane and which has placed him in a maximum security hospital for an indefinite period after he had displayed his tendencies even in other hospital environment, and where the hospital authorities speak of possible vocational rehabilitation "at a later date". Certainly one cannot persuasively argue that his impairment is not a medically determinable one when his commitment is by court order based on psychopathic personality findings in which licensed physicians participate and when physicians have found that his problem has existed since age 13 with little change. And certainly one cannot persuasively argue that there is ability to engage in substantial gainful activity when, despite his ability as a salesman, he could pursue that calling or any other, as this record consistently reveals, only under the closest and most continuous supervision. Rare, indeed perhaps even non-existent, would be the reputable employer who, knowing of the applicant's assaultive tendencies, would hire him. We deal here with a hard and unfortunate reality of life. We may not ignore that reality. See Clements v. Celebrezze, 216 F.Supp. 78, 80–81 (W.D.Va.1963), cited with approval in Hanna v. Celebrezze, 233 F. Supp. 239, 248 (W.D.Ark.1964); Hill v. Celebrezze, 233 F.Supp. 298, 301 (E.D.S.C.1964); Bush v. Celebrezze, 239 F.Supp. 688, 693 (D.Ore.1965); Celebrezze v. Warren, 339 F.2d 833, 838 (10 Cir. 1964).

■ We need not go so far as to say that the cited regulation, 20 C.F.R. § 404.1519(c) (2) (iii), is invalid in all respects. When it is inconsistent with the statute it must, of course, give way. We regard it as a general guide and not as establishing a complete barrier to a sexual deviant's qualification under the statute. The error in the present case, we feel, is in the hearing examiner's and the district court's too rigid interpretation of the regulation.

■ We take the trouble at this point to emphasize that we are not holding, despite the Secretary's suggestion in that

vein,[3] that homosexuality in itself is a disability within the meaning of the statute. History and common knowledge teach us otherwise and disclose that many persons with homosexual tendencies have been economically productive and, indeed, have achieved marked success in many fields. Similarly, many persons with severe physical and mental handicaps of a nature more readily accepted and understood have done the same. We hold here only that this unfortunate young man—and we so characterize him, irrespective of the reasons, self-caused or externally imposed, which have brought him to his present state—meets the definition of disability presently prescribed by 42 U.S.C. § 423(c)(2). The next homosexual's case may have a contrary result.

This is a sensitive and, for many, an emotional area and one where misunderstanding often exists or where there frequently is a complete absence of understanding. We have endeavored, as we must, to judge this case by its facts.

■ We recognize, too, that imprisonment or enforced hospital confinement ordinarily renders one unable to pursue his occupation and to earn a livelihood. We must emphasize, however, that we are not holding that confinement imposed by court order automatically equates with the statutory disability. If this were so, incarceration for crime would appear to produce and require a like result. Clearly, court-imposed hospitalization or incarceration is not, of itself, the kind of disability contemplated by the statute. If, however, the confinement is occasioned "by reason of any medically determinable physical or mental impairment", etc., there is no reason why the statutory disability may not be established if the other prescribed conditions are met. Such is the situation with respect to this applicant.

We venture no opinion as to the applicant's continuing qualification for disability benefits when, if ever, he gains

his release from commitment under the Minnesota Act.

Reversed and remanded with directions to enter judgment for the plaintiff. Pursuant to 42 U.S.C. § 406(b)(1), fees are allowed the applicant's attorneys, Mary P. Walbran and John W. Walbran, in an amount equal to 25% of the total of benefits past due as of the filing date of this opinion; these fees shall be reflected as part of the judgment.

---

3. The Secretary's brief asserts, "The appellant's brief is dedicated to the principle that homosexuality is a sufficient cause for Social Security benefits."