**Burton G. UNDERWOOD, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

No. 15225–1.

United States District Court
W. D. Missouri, W. D.

May 4, 1967.

S. Richard Beitling, Dan K. Purdy, Kansas City, Mo., for plaintiff.

F. Russell Millin, U. S. Dist. Atty., John Harry Wiggins, Asst. U. S. Dist. Atty., Kansas City, Mo., for defendant.

---

31. United States v. Chas. Pfizer & Co., 217 F.Supp. 199, 201 (S.D.N.Y.1963); United States v. Klein, 124 F.Supp. 476, 479–480 (S.D.N.Y.1954).

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

This is the second review of this case. On July 20, 1965 we remanded the case for the purpose of receiving additional evidence in regard to plaintiff's mental impairment and for the hearing examiner to make specific findings in accordance with the applicable statute, Section 423(c) (2), Title 42, United States Code.

Because plaintiff's motion for summary judgment must be granted and defendant's similar motion denied, we shall state in some detail the facts and the applicable law.

### I.

The following from the first hearing examiner's decision accurately describes plaintiff's history before he was shot in July, 1957:

Claimant is 36 years old [now 39 years old], having been born November 4, 1927, at Rochester, Minnesota. He is 6′ tall and weighs 147 pounds. He stated that his normal weight was 165 pounds which he testified he last weighed when he was shot on July 18, 1957. Mr. Underwood is right handed.

Until he was 14 or 15 years old, he was raised in Rochester, Minnesota. The claimant never knew his father, who has been in a mental institution at least all of the claimant's life. The claimant's mother is presently in a mental institution in Rochester, Minnesota. Burton Underwood was raised in various homes. He was promoted through the fifth or sixth grade since he got too big for the seats in the lower grades. Claimant said that he cannot read or write to any extent whatsoever. He had trouble all the time he was in school and stated that the truant officer picked on him. When he was about 15 years old, they sent him to reform school in Red Wing, Minnesota since he was not doing well in the public schools. He could not learn in reform school so they put him to work mending socks. When he was 17 years old, he was released to go into military service. In January, 1944, at age 17, the claimant entered the United States Navy. He had boot training with a special group which consisted of various persons from prisons. * * * In 1948, he received an undesirable discharge. (Tr. 7-8).

Plaintiff's earning record, introduced in evidence at the remand hearing, shows that from the time of his discharge from the Navy in 1948 until 1962, plaintiff had many jobs for short periods of time in various parts of the country.

The first hearing examiner described the injury resulting from the shotgun blast:

In July, 1957 he was shot by a woman. He did not work again until the latter part of 1961 when he drove a cab. He last drove a cab in October, 1962 and was fired because of various wrecks he had. He stated that he had 15 wrecks and put six persons in the hospital. * * *

The claimant testified that he has very little use of his right hand. * * he could pick up light objects and that he does have some control over the hand. He could not make a fist with his hand. Claimant testified that he can bend his right arm a little past 90 degrees toward the upper part of his arm. He also can raise his right arm some. As a matter of fact almost straight up in the air by the side of his head. He can raise his right arm up to the side. However, there is a definite loss of strength with obvious atrophy in the upper right part of the musculature of his arm. Most of the right thumb is missing. The upper right arm is small. [Tr. 10].

The following statement of the first hearing examiner and his description of the testimony of particular witnesses at the first hearing indicated that the first hearing examiner might not have had in proper focus the real factual questions

presented by this case. The first hearing examiner stated:

> He [plaintiff] testified that he has dizzy spells and passes out. At times his vision just fails and he can hear things in the distance. He has no strength to move. This hardly ever happens to him unless he is active. Then it may occur three or four times a day. Some days he just can't seem to get up. If he walks a half mile or moves around too fast, then the dizzy spells come on. The spells are more frequent when he is tired. The claimant is going once a week to the psychiatric receiving center in Kansas City, Missouri. He is taking group therapy. In his group there are three to six people. He goes from 11:30 a. m. to 1:00 p. m. one day a week and has been going for five months. He testified that they told him he needed at least another six months of therapy. He felt that he did not get a chance to tell them his troubles. One time recently he fell asleep at the Psychiatric Receiving Center while listening to the problems of another patient in which he was not particularly interested. The claimant stated that he is not taking medication since it tends to make him want to go out and kill people. He is not taking any medication, including aspirin or empirin. [Tr. 10–11].

In describing the testimony of the Director of the Jewish Vocational Service, the hearing examiner stated "the big question in the mind of the witness was whether or not the claimant can exercise enough control so that he can work." [Tr. 12].

Dr. John Barnard made two reports in regard to the plaintiff's condition. The first hearing examiner stated that "in his last report, Dr. Barnard states that he feels that the claimant should have some psychiatric treatment since he believes that this is the major portion of his disability." [Tr. 15].

In describing the testimony of the psychologist for the Rehabilitation Institute, the first hearing examiner stated "the psychologist felt that the patient could perform in the average range if he so desired but that he does not seem to be interested in anything but assuring himself that he will receive social security benefits. The psychologist also believed that the patient was completely unemployable at the present time due to his attitudes and his emotional adjustment." [Tr. 17].

In light of that evidence, and without any apparent support for his factual findings, the first hearing examiner concluded that:

> The chief problem that is troubling the claimant is, of course, his emotional status. * * * The claimant himself appears to have more ability than has been developed. This is unfortunate, but in view of the claimant's background, assuming that it is factually accurate, these problems can be understood and sympathy can be extended to the claimant since he is going to have difficult problems until he can adjust himself better to competitive economic life. However, this failure to adjust himself does not constitute a disability within the meaning of the Social Security Act. [Tr. 19–20].

When we made our order of remand we anticipated that the remand hearing would be focused on what we described as the "real question" in regard to plaintiff's mental ability to perform any type of work. The evidence adduced at the second hearing, together with some of the evidence adduced at the first hearing, demonstrates that plaintiff's mental impairment was a matter of concern from almost the beginning of the administrative processing of plaintiff's claim. That evidence, however, also demonstrates that the defendant was primarily concerned in attempting to build a record upon which a denial of plaintiff's claim could be fitted into the language of the Section 404.1519(c) (2) of the Regulations quoted in the first hearing examiner's decision [Tr. 18].

Defendant's Report of Contact of December 26, 1962, stated that plaintiff

"has tried to find work since his employment was terminated in October, 1962" [Tr. 142]; noted that "W/E is eager to work—says he will accept any kind of job which he is able to do" [Tr. 144]; and stated that "he spends a lot of time trying to find a job" [Tr. 146]. That early report also noted that "W/E's condition has made him nervous all the time. He says he does not get depressed, as he has learned to live with it." [Tr. 146].

The next Report of Contact, dated May 3, 1963, makes clear that plaintiff's mental condition was a subject that could not be ignored. That report, reproduced on page 171 of the transcript stated the following:

The wage earner has not worked since September, 1962. He has been unable to find any work since September 1962 because of his disability. He has no use of his right hand and arm. He suffers from constant headaches, dizziness and blackout spells. He is taking no medication at this time. He sees Dr. Pilger once to twice every week. He presently owes Dr. Pilger a large bill which he is unable to pay. The wage earner advised that his mother, father and an aunt are presently confined to mental institutions. His mother has been in a mental institution in Rochester, Minnesota for over 20 years.

The effect of what was described as plaintiff's "nervousness" was stated as follows:

He [plaintiff] stated no one will hire him since he has no use of his right hand and arm, and because of his nervousness.

The wage earner was cooperative but somewhat antagonistic because of the denial of his claim. He was neatly dressed, very clean and smooth-shaven. He appeared to be very tense and worried about his condition. He stated he is afraid to drive when he is upset because he might injure someone. [Tr. 172].

Dr. Dewey K. Ziegler gave plaintiff a neuro-psychiatric examination on May 24, 1963 and reported his findings to Vocational Rehabilitation on May 27, 1963. Dr. Ziegler stated that "psychiatric examination presents many remarkable abnormalties." In summary Dr. Ziegler concluded that "the patient's whole manner is that of a severe personality disorder with somatic manifestations, manifested by dizziness, muscle aches and pains and by overt personality disturbances with anxiety, hostility, dependency and passive aggressive personality." [Tr. 178].

In January of 1964, plaintiff participated in the workshop program of the Rehabilitation Institute. The report of his workshop supervisor stated:

The client did not demonstrate, while in the shop, any positive ego strengths or physical strengths on which we could capitalize. We felt that he is operating under a very low work tolerance level. He was able to relate in a quite positive fashion with his supervisors and co-workers, however, his conversation much of the time was completely inadequate in relation to the people who he was working with. We feel that he needs to make many personal and psychological adjustments before he would realize an adequate concept of the worker rule. [Tr. 189].

The counseling psychologist of the Rehabilitation Institute stated in his report that he "was impressed by his [plaintiff's] hostility and suspiciousness and very thinly veiled paranoic ideation" [Tr. 190], and expressed the opinion "this man is completely unemployable at the present time due to his attitudes and his emotional adjustment" [Tr. 191]. The following conclusions and recommendations were given by Mr. Leslie in that February, 1964 report:

CONCLUSIONS AND RECOMMENDATIONS: Burton Underwood is currently functioning in the average range of intellectual ability, according to my best estimate based on two subtests of the Wechsler Adult Intelli-

gence Scale. His personal adjustment is quite inadequate in terms of competitive employment, but he does seem to be functioning fairly satisfactorily as long as some of his demands and needs are met. He seems to be operating with a great deal of paranoid ideation and generalized passive aggressive behavior tendencies. He is quite hostile toward his environment, in general, and expects that his environment will provide him with enough money to satisfy his needs. I do not feel that this man is at all employable due to his attitudes and his personal adjustment. Unless he is able to demonstrate a great deal more motivation to work than he did during the initial week, I feel that he should be terminated after the first three weeks in the Work Evaluation Program. In general, the vocational prognosis in this case seems to be quite poor at the present time. [Tr. 192].

Dr. Barnard, plaintiff's orthopedic surgeon, expressed the view on February 28, 1964 that plaintiff probably should have psychiatric treatment because "I feel the major portion of his disability is probably psychic" [Tr. 196].

The psychologist's report of April 23, 1964 from the Psychiatric Receiving Center operated by the Greater Kansas City Mental Health Foundation stated the following:

Mr. Underwood is currently in group therapy on a once a week basis, lasting at least for the next six months. He began formal treatment March 27, 1964 and has attended regularly except for one session when he arrived at the very end of the hour. Prior to being assigned to this permanent group he went through an evaluation process, which lasted a few weeks. During that time he saw Dr. Simmons and Dr. V. Glad. Since they only had his picture of things to go on they found it very difficult to separate fact from fancy. Unfortunately, he was not able to take our usual paper and pencil psychological tests because he stated he couldn't read or write. Although

we found this hard to believe (he certainly appears to be a man of at least average intelligence) we had to accept his word for this. Unquestionably, however, they recognized that he was in need of treatment. [Tr. 200]

Conceding that "as yet we don't fully see or understand how he sees things," that report concluded:

In group therapy we hope to acquire more information about him, how he handles social situations, and how far he may go in the direction of making changes. So far we have found him to be evasive, confused, suspicious, provocative to other patients, but also trying to get close to other people.

From a psychological point of view the group members find him very hard to tolerate and we feel that any employer would probably feel the same way. He has very few behavior patterns which would endear him to people.

In sum then, we feel (and this is to be sure based on a limited amount of evidence) that Mr. Underwood might be termed a Paranoid Personality who has a very tenuous hold on reality when faced with frustrating situations. [Tr. 200–201].

The final result of plaintiff's psychotherapy and his psychiatric diagnosis were reported September 21, 1964 by Dr. Hornstra of the Psychiatric Receiving Center as follows:

Mr. Underwood has been in group psychotherapy for six months. He has made no change and we would not expect him to change as a result of further psychotherapy. His behavior towards others is consistently needling and provoking, he has irritated everyone in the group and has provoked some to intense anger toward him. He is unable to express warmth or even genuine concern toward others and is unable to accept warmth or concern for him from others. He states that everyone is against him and then behaves in such a way that his statement is soon proven true. He states

that the world owes him something and that he aims to get it by hook or by crook. He brags of his anti-social activities, of his failures, and of the tragedies that have happened to him. He continually emphasizes how he has been mistreated, rejected and punished. He does not accept any responsibility for himself but continually blames other people for what happens to him.

These behaviors and these attitudes have defeated his treatment. He has been unable to listen or at all work on his problems. He has been disruptive and irrelevant and has generally been an obstacle to working on problems of other members. His statement that he can not read or write prevented us from obtaining psychological testing with him and has further made it difficult to explore his problems. We have not been able to get close to him or his problems.

We feel that his behaviors and his attitudes are so ingrained, are so chronic, that he will not be able to hold a job for any length of time. He will not be able to establish satisfying social relationships for any length of time. In short, he is incapable of adequate social functioning, and this appears to be a chronic state. If Mr. Underwood had no physical problems whatsoever, he would still be unable to maintain a job.

Our psychiatric diagnosis of Mr. Underwood is Paranoid Personality. [Tr. 341].

After we had remanded this case in July of 1965, defendant did not immediately set this case for the reception of additional pertinent and relevant evidence. Defendant instead began to attempt to build a defense against plaintiff's claim. It is obvious that the second hearing examiner from the outset intended to make what he would call a finding of fact that plaintiff's obvious mental impairment must be labeled something other than a psychosis and that, by application of Section 404.1519(c) (2) of the Regulations, he would determine that plaintiff was not legally entitled to the disability insurance benefits provided by the Social Security Act.

A memorandum to the Office of the Chief Medical Advisor from Dr. John Nardini, Special Consultant in Psychiatry, reviewed the data assembled at the first hearing. Dr. Nardini at no time ever saw plaintiff. Yet he stated in the summary of his report the following:

In summary, then, this would appear to be a paranoid personality in an individual who is very poorly motivated but who is not considered medically or psychiatrically incapable of carrying out gainful employment. Careful review of each of the reports in the record would seem to support this clearly. [Tr. 386].

While Dr. Nardini agreed that Dr. Ziegler "is a very competent psychiatrist and neurologist, Board-certified, and holds a professorial appointment at the University of Kansas Medical School," he rejected Dr. Ziegler's 1963 opinion because:

There is nothing in the record to support that he [plaintiff] has at any time broken his contact with reality even in the face of what would seem to have been very frustrating situations. There is nothing in the record to adequately suggest a psychotic condition, which would be essential if one were to be concerned about his ability to maintain a hold on reality. Furthermore, the mere guess that one may have difficulty in maintaining reality does not establish a psychotic condition. [Tr. 386].

Dr. Nardini obviously was of the firm opinion that if plaintiff's mental impairment should be labeled a "personality disorder" there would not be any liability under the federal statute.

The remand hearing examiner's letter to Dr. Donald C. Greaves, another of the defendant's medical consultants, written December 4, 1965, reflected the same

erroneous view of the law. The first paragraph of that letter stated:

I deem it necessary to obtain your professional opinion in connection with the claim of Mr. Burton G. Underwood, 1200 East 11th Street, Kansas City, Missouri, for disability benefits under Social Security Law which is now before the undersigned Hearing Examiner as a result of the case having been remanded by the United States District Court for additional evidence and adjudication prior to being returned for the Court's action. [Tr. 332].

The new hearing examiner forwarded for Dr. Greaves' examination various of the medical reports and other data received in evidence at the first hearing and then stated:

I would appreciate receiving from you an evaluation and analysis of the medical evidence regarding the claimant's mental and/or emotional condition insofar as it affects his ability to perform substantial work, or your opinion as to whether after reviewing the various medical reports you feel that it is necessary to obtain additional psychiatric or psychological examinations before such evaluating may be finished. [Tr. 332].

The decision that the remand hearing examiner intended to render provided that something in the record could be said to support a diagnosis labelled "personality disorder," is apparent from the following paragraph of his letter to Dr. Greaves:

Since incapacity solely by reason of a personality disorder is not compensable under the Social Security Act, it is particularly desired that your evaluation delineate the amount of dysfunction, if any, attributable strictly to other psychiatric impairments and whether such impairments are in the form of a neurosis or psychosis; in other words, we would like to know, if possible, what degree of impairment is due strictly to the claimant's personality disturbance or behavior characteristics and what, if any, inability to function is due to medically determinable psychiatric impairments. [Tr. 333, emphasis ours].

On December 10, 1965, Dr. Greaves replied that "on the basis of the available evidence I would agree that this claimant seems to present a fairly severe personality disorder of the passive-aggressive type." But Dr. Greaves suggested that "from the narrative accounts of the Rehabilitation Institute and Dr. Dewey K. Ziegler I can find no evidence of either a neurosis or psychosis." [Tr. 334]. Like Dr. Nardini, defendant's other medical consultant, Dr. Greaves stated that "I have no question that Dr. Ziegler is perfectly competent to recognize the existence of psychosis or neurosis, even in the absence of a complete battery of psychological tests" [Tr. 334].

Dr. Greaves, for what we believe are obvious reasons, stated that he "would hesitate to recommend further evaluation of either a psychiatric or psychological nature" [Tr. 334]. That recommendation carried with it the idea that further psychiatric or psychological evaluation might very well eliminate any possible basis on which plaintiff's claim could be denied.

Further psychological and psychiatric examinations were eventually obtained. Both reports confirmed Dr. Greaves' forecast that further evaluation of plaintiff's mental impairment would be adverse to the defense against plaintiff's claim. On January 14, 1966, Dr. Kenneth Wilcox gave plaintiff a full battery of tests including Revised Beta, Rorschach, Draw-A-Person, Minnesota Multiphasic Personality Inventory, and Bender-Motor-Gestalt. Dr. Wilcox's summary stated:

Summary: Mr. Underwood, from psychological evaluation, appears to be a character disorder of a passive aggressive type. He has weak ego strengths and tends to yield to his physical disability as a method of satisfying dependency needs. The strong need to express his hostility toward society through becoming dependent

as a result of physical disability accounts more for his failure to perform at a reasonable level than does malingering per se. Prognosis for change as a result of therapeutic intervention is nil. Mr. Underwood will continue to show the typical character disorder's inability to learn from past experiences and will continue to find ways to express his excessive dependency demands upon society and others. Anxiety engendered by the failure of society to meet his demands for dependency will continue to create a loss of psychological economy for Mr. Underwood and he may be expected to react to frustration with rather senseless schemes and plots which have some paranoid flavor. It should be noted that his efforts to appear bad or to appear helpless are not of the sort associated with malingering but are directly associated with his desperate need to be taken care of. [Tr. 350–351].

Dr. Alfred Owre, Jr. examined plaintiff on January 22, 1966. He presented his neuro-psychiatric evaluation in a report dated January 31, 1966. In that lengthy and detailed report Dr. Owre set forth the data upon which his opinions were based. His conclusions were stated as follows:

*Psychiatric Diagnosis.* Chronic Undifferentiated Schizophrenic Reaction; m/b inappropriate affect, autistic concerns, loose thought associations, and marked ambivalence; in poor social remission. Prognosis is guarded.

*Recommendations.*

1. Psychiatric Management to include structuring and support. He has been proved to be inaccessible to psychotherapy.

2. Since, in the examiner's opinion, he is virtually unemployable because of a schizophrenic pattern of existence—the thought disorder controls his actions, in other words—other means of support might be considered. [Tr. 355].

The second hearing examiner devoted most of his decision to an effort to reject Dr. Wilcox's finding that plaintiff was not a malingerer and Dr. Owre's opinion that plaintiff is "virtually unemployable." That effort, of course, also undertook the task of attempting to discount all of the undisputed evidence adduced at both hearings in regard to plaintiff's mental impairment.

The rationale of the second hearing examiner's decision was based on the notion that Dr. Greaves' testimony somehow created a conflict in the evidence. Dr. Greaves, of course, never examined plaintiff. Dr. Greaves commendably was the first to concede that if he had examined plaintiff he might have formed an entirely different judgment than that which he expressed at the hearing.

We quote the following from page 276 of the transcript:

ATTORNEY: Yes. Doctor, you have never had an opportunity to personally talk with, examine or interrogate in any way Mr. Underwood?

DR. GREAVES: No, I have not.

Q. Therefore, I take it that your professional opinion has necessarily been limited to the writings of the other physicians who have seen him or the psychologists who have seen him and submitted reports.

A. All of the documents Mr. Reese has forwarded to me, yes.

Q. Therefore, would I be safe in assuming, say, that if you had the opportunity of giving a proper psychological examination or psychiatric examination to Mr. Underwood, could, therefore, your diagnosis based on these reports possibly be different than what you have said today your opinion was?

A. Certainly, it could.

Q. Would you, therefore, also feel in a better position, probably, from a psychiatrist's standpoint and a doctor's standpoint, of being able to give some kind of a diagnosis if you had the opportunity of examining and talking to Mr. Underwood sufficiently?

A. Why, I don't think there is any doubt about the fact that if I were to make a diagnosis and sign my name to it, I would want to examine him, myself.

■ On page 10 of his recommended decision [Tr. 221] the remand hearing examiner stated that "Dr. Greaves testified that upon reviewing all the evidence, he saw no indication that the claimant had a psychosis and psychoneurosis." But such a statement, of course, ignores Dr. Greaves' positive testimony that he would want to examine plaintiff personally before he would make *any* diagnosis. It also ignores the fundamental principle that the opinion of any expert must rest upon a valid base, else it is worthless.

The remand hearing examiner was seemingly impressed with what he called Dr. Greaves' "opinion" that "the primary problem in claimant's case was lack of motivation." [Tr. 223].

In an effort to build an alleged conflict in the medical evidence, the remand hearing examiner suggested by way of introduction that:

All of these psychiatrists and psychologists have assessed the claimant's impairment as a severe personality or character disorder of the passive aggressive type, and several have attributed his major difficulty to lack of proper motivation. [Tr. 226].

Interestingly enough, the remand hearing examiner makes clear that the January, 1966 reports and evaluations of Drs. Wilcox and Owre had not been made available to Dr. Greaves in connection with the hearing examiner's letter to him of December 4, 1965. It is so stated on page 226 of the Transcript:

Dr. Donald C. Greaves, an eminent psychiatrist, to whom this Hearing Examiner submitted all of the medical evidence, with the exception of the reports from Dr. Wilcox and Dr. Owre which were received subsequent to Dr. Greaves' written evaluation, confirmed the opinion that this gentleman was afflicted with a severe personality dis-

order and also he found no evidence of either a neurosis or psychosis.

The remand hearing examiner obviously believed that there were differences other than that of language in the medical evidence. His distorted comprehension of psychiatric evaluation is revealed by the following:

Obviously, Dr. Owre's impression and evaluation of the claimant was different from those of all the other psychiatrists and psychologists who evaluated claimant's mental condition. However, as Dr. Greaves pointed out in his testimony, Dr. Owre's conclusions were based partly on the claimant's statement that he often heard imaginary voices saying bad things about him, and that he was pretty well used to them, since he had heard them for years. Furthermore, as Dr. Greaves pointed out, the record contains no objective evidence at all that hallucinations and delusions did occur, and the psychological testing did not reveal any evidence of abnormal thought process. It appears that Dr. Owre's conclusions were based largely on accepting the claimant's word that such aberrations actually existed. [Tr. 227].

Surely, one in the throes of delirium tremens, to take a not unfamiliar example of a phenomenon involving hallucinations, apparently sees purple snakes, little men in tall green hats, spiders six feet high and whatnot. But how and when can there be any objective demonstration of the fact that such sights were apparently perceived by the victim? It is nonsense to demand that "objective evidence * * * that hallucinations and delusions did occur" be produced.

The remand hearing examiner's decision reflects but an application of the untenable legal conclusion initially stated in his letter of December 4, 1965 to Dr. Greaves. Before the remand hearing examiner heard any evidence adduced at the second hearing, he stated his conviction that "incapacity solely by reason of a personality disorder is not compensable under the Social Security Act". [Tr.

333]. In implementation of that preconceived conviction, the remand hearing examiner stated on page 227 of the record that:

> Upon studying all the evidence, it is the opinion of this Hearing Examiner that the preponderance of the medical evidence shows that the claimant has a rather severe character disorder of a passive aggressive type with some paranoid characteristics. It is believed that Dr. Owre's stated diagnosis of undifferentiated schizophrenic reaction is not supported by the objective findings and the better evidence of record. * * * In any event, it is the Hearing Examiner's considered opinion that the preponderance of the psychiatric and medical evidence impells [sic] the conclusion that the claimant's psychiatric ailment is correctly diagnosed as a character disorder of a passive aggressive type, or personality trait disturbance.

Having placed what he believed was a nonliability label on plaintiff's obvious mental illness, he then made application of Section 404.1519(c) (2) (iii) of the regulations. The applicable Section of the statutes, Section 423(c) (2), Title 42, United States Code, was not even mentioned. The remand hearing examiner, in following the exact pattern followed earlier by the first hearing examiner, stated:

> Under the Regulations implementing the disability provisions of the Social Security Act, personality disorders by themselves are not disabling. However, they may be if there is adequate evidence demonstrating that the presence of inadequate or socially unacceptable behavior are symptomatic of underlying organic brain syndrome, or functional mental illness, provided the underlying organic brain syndrome or functional mental illness is of sufficient severity. See CFR 404.-1519-(c) (2) (iii). None of the examining psychiatrists or psychologists, with the possible exception of Dr. Owre, has found that the claimant was psychotic or had a significant neurosis. [Tr. 227].

The remand hearing examiner, in a manner consistent with his uninformed demand for objective evidence of hallucinations, commented at length on the subject of motivation. See page 228 of the transcript for an example. He there stated:

> It appears that the claimant's character disorder is complicated and aggravated by his lack of motivation, or, as might be said, his motivation in the wrong direction. In the psychological evaluation of Dr. Leslie (Exhibit 20) * * * the psychologist stated, "I do not feel this man is at all employable due to his attitudes and his personal adjustments, unless he is able to demonstrate a great deal more motivation to work than he did during the initial week I feel that he should be terminated after the first three weeks of work evaluation program." This opinion is supported by the testimony of Dr. Greaves, the expert witness, who stated at the hearing, "from the evidence I reviewed I would say the primary problem here is lack of motivation." * * *

In this connection, in speaking of motivation Dr. Greaves evidently was speaking in addition to lack of motivation to work, also of lack of motivation on the part of the claimant to do something about his attitudes, or character deficit, particularly in reference to seeking medical help to that end. * * * It would seem that the claimant not only does not have sufficient motivation to change his behavior or really attempt to work, but actually he is motivated in the opposite direction, in an attempt to capitalize on that very behavior by convincing someone that his behavioral characteristics entitle him to monetary benefits. This theory carried to the extreme would mean that any individual who would not conform to the ordinary behavioral requirements of society in general, would by his very behavior and characteristics

be considered to be "disabled." [Tr. 228–229].

All of the remand hearing examiner's moralistic talk about motivation, of course, assumes, contrary to all the medical evidence, that plaintiff has complete control over what does and does not motivate him. In short, it assumes, again contrary to all the undisputed medical evidence, that plaintiff is not mentally ill.

Based on what has been stated in detail, the remand hearing examiner concluded that:

> In sum, the Hearing Examiner is unable to find on the record as now constituted that the claimant is unable to engage in substantial gainful activity by reason of medically determinable physical and/or mental impairments. That conclusion is supported by the expert medical opinion of Dr. Greaves, an eminently qualified psychiatrist, who indicated that upon a review by him of all the evidence concerning the claimant's emotional, mental and behavioral characteristics, such manifestations would not prevent the claimant from engaging in all forms of work. [Tr. 230].

That conclusion, of course, is not supported by the "expert medical opinion" of Dr. Greaves because Dr. Greaves expressed no such opinion; he was not even asked to examine and evaluate plaintiff's mental condition. Nor is that conclusion and the formal findings of fact [Tr. 230–231] based on any other substantial evidence for the reason that there is none in this record that can be said to support such a conclusion or the formal findings entered of record.

The prime difficulty with the decisions of both hearing examiners is that they sought to place labels on plaintiff's mental condition as directed by administrative regulations instead of making the findings of fact contemplated by the Congress.

■ Under the law that we now discuss it is clear that plaintiff's motion for summary judgment must be granted.

## II.

We first outline defendant's argument in support of the pending motion for summary judgment. Defendant argues that "there is substantial evidence to support the Secretary's decision that plaintiff's mental condition is not disabling within the meaning of the Act." Defendant neither cites nor does he discuss the applicable provision of the Act. Instead he sets forth the following Regulations:

Section 404.1519(c) (2) of the Social Security Administration Regulations No. 4, 20 CFR 404.1519(c) (2):

Functional mental disorders (psychoses, psychoneuroses, personality disorders). The mere presence of psychotic or psychoneurotic symptoms and signs is not necessarily incompatible with the ability to perform substantial gainful work. Consideration is given to whether evidence shows regression or deterioration of the individual's intellectual behavioral or emotional reactions and whether the defects so impair the effectiveness and predictability of the individual's behavior so as to be incompatible with occupational activity. Some of these disorders frequently respond adequately to treatment. Spontaneous remissions may also occur.

Section 404.1519(c) (2) (ii) of the Regulations:

In determining the effect of psychoneuroses, consideration is given to whether the psychoneurosis has resulted in severe social, personal and occupational regression or confinement to a mental hospital and whether it persists despite appropriate treatment. The manifestations of tension, anxiety, depression or psychophysiological disturbances, behavioral disturbances, hysterical reactions or obsessive compulsive patterns should be carefully described. An adequate psychiatric examination is generally necessary.

Section 404.1519(c) (2) (iii) of the Regulations:

Personality disorders. Personality disorders are characterized by patterns

of socially unacceptable behavior, such as chronic alcoholism, sexual deviation and drug addiction. *In the absence of an associated severe psychoneurosis or psychosis, a personality disorder does not in itself result in inability to engage in substantial gainful activity.* A person confined in a correctional institution because of antisocial behavior will not be considered disabled unless he has other severe impairments which would preclude any substantial gainful activity if he had not been so confined. (Emphasis supplied [by defendant]). [Defendant's Suggestions in Support of Motion for Summary Judgment].

In the same pattern as that followed by the remand hearing examiner's decision, defendant's argument is based on the language of the regulation emphasized by defendant in his brief, namely, "In the absence of an associated severe psychoneurosis or psychosis, a personality disorder does not in itself result in inability to engage in substantial gainful activity." The applicable law, as distinguished from the regulation, contains no such restriction. Such a restriction cannot be imposed on plaintiff's right to recover save only by an Act of the Congress.

Defendant argues, as did the hearing examiner, that:

Dr. Greaves reviewed the medical and psychiatric evidence in plaintiff's case and concluded that there was no basis for a finding of psychoses or neurosis.

All of this constitutes substantial evidence to support the Secretary's decision. True, Dr. Owre said that plaintiff suffered a schizophrenic reaction, and Dr. Hornstra diagnosed plaintiff as paranoid and unable to work. But Dr. Owre reached his conclusion by taking plaintiff's word that he suffered auditory hallucinations, and Dr. Hornstra did not give plaintiff the thorough examination that other doctors of record gave. Under the law, conflicts in the evidence must be resolved by the Secretary as trier of fact. [Defendant's Suggestions in Support of Motion for Summary Judgment.]

That argument is not tenable. Had the remand hearing examiner the benefit of Judge Blackmun's opinion in Marion v. Gardner, 8 Cir. 1966, 359 F.2d 175, decided subsequent to the date of the second hearing examiner's decision, it is doubtful whether this case would have been before this Court the second time. In Marion v. Gardner, as in this case, the hearing examiner based his decision on Section 404.1519(c) (2) (iii) of the Regulations. On page 179 of 359 F.2d, it is stated:

The hearing examiner based his conclusion that the applicant was not entitled to disability benefits primarily upon the social security regulation having to do with personality disorders. This is 20 C.F.R. § 404.1519(c) (2) (iii), 42 U.S.C.A. Appendix p. 494. The examiner ruled that the applicant fell into this category; that his disorder was not associated with a severe psychoneurosis or psychosis; and that he had no other impairment which would preclude any substantial gainful activity if he were not confined.

The discussion of recent Eighth Circuit opinions in Marion v. Gardner makes it unnecessary to discuss the cases cited and relied upon by the defendant. For the most part, those cases are cited and discussed by Judge Blackmun in his opinion in the cited case. The guidelines for our review were established by Marion v. Gardner as follows:

This court in recent opinions has held that an applicant has the burden of establishing his claim; that the Social Security Act is remedial and is to be construed liberally; that the Secretary's fact findings and the reasonable inferences to be drawn from them are conclusive if they are supported by substantial evidence, 42 U.S.C. § 405 (g); that substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; that the determination of

the presence of substantial evidence is to be made on a case to case basis and on the record as a whole; that where the evidence is in conflict or subject to conflicting inferences it is for the Appeals Council, on behalf of the Secretary, to resolve those conflicts; that the statutory definition of disability imposes the threefold requirement (a) that there be a medically determinable physical or mental impairment of the type specified by the statute, (b) that there be an inability to engage in any substantial gainful activity, and (c) that the inability be by reason of the impairment; that substantial gainful activity is that which is both substantial and gainful and within the claimant's capability, realistically judged by his education, training and experience; and that the emphasis is on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable or theoretical. Celebrezze v. Bolas, 316 F.2d 498, 500–501 (8 Cir. 1963); Celebrezze v. Sutton, 338 F.2d 417, 418 (8 Cir. 1964); Brasher v. Celebrezze, 340 F.2d 413, 414 (8 Cir 1965). [359 F.2d 179–180].

■ Marion v. Gardner specifically teaches that we must "look * * * at the specific language of the federal statute" not to the language of the regulations. And the district courts must see what the Court of Appeals saw when it looks at the federal statute. So far as the federal statute is concerned:

We find nothing there, beyond the threefold requirement, which is otherwise restrictive. We find nothing which separates the psychoses and the psychoneuroses from other types of impairment. And we would be reluctant, indeed, to pivot a conclusion upon a currently accepted—but subject to change—definition of a particular psychiatric term or phrase. [359 F.2d 181].

Speaking specifically about the restrictions added by Section 404.1519(c) (2) (iii) of the Regulations, Marion v. Gardner held:

We need not go so far as to say that the cited regulation, 20 C.F.R. § 404.1519(c) (2) (iii), is invalid in all respects. When it is inconsistent with the statute it must, of course, give way. We regard it as a general guide and not as establishing a complete barrier to a sexual deviant's qualification under the statute. The error in the present case, we feel, is in the hearing examiner's and the district court's too rigid interpretation of the regulation. [359 F.2d 181].

We find and determine in this case that the regulation was applied as a complete barrier to plaintiff's right to recover and that there was no substantial evidence to support a finding that plaintiff did not meet the threefold requirement of the statute.

We further find and determine that the only conflict in the evidence related to what label should be placed on plaintiff's obvious mental impairment and that the restrictive language of the regulation was applied to deny liability in a case in which the undisputed evidence established liability under the federal statute.

Both decisions of the hearing examiners paid slavish regard to the labels to be placed on plaintiff's mental impairment. Neither decision attempted to sustain their respective denials of liability on the basis of testimony of witnesses who examined and evaluated plaintiff's mental impairment. Both predicated their denials of liability on the preconceived notion that "a personality disorder is not compensable under the Social Security Act" (quoted from the hearing examiner's letter of December 4, 1965 to Dr. Greaves) and on the solicited conclusions of defendant's employed medical consultants that there was "no evidence of either a neurosis or psychosis" (quoted from Dr. Greaves reply of December 10, 1965).

The labels of "personality disorder," "psychosis," and "neurosis" were considered by defendant to have medical meaning as definite and as settled as the labels of small pox, measles and whooping

cough. Nothing could be further from the medical truth. Judge Burger, concurring in Blocker v. United States, 1961, 110 U.S.App.D.C. 41, 288 F.2d 853, at 861, (to which attention was directed in Marion v. Gardner at 181 of 359 F.2d), quoted Dr. Phillip Roche, distinguished author of The Criminal Mind (1958), an Isaac Ray Award book, in footnote 11 as follows:

Two of the most frequently encountered terms in psychiatry are 'psychosis' and 'psychoneurosis' ('neurosis') and it might appear that in such currency their meaning should be settled in universal agreement. This is not the case. Not only is there confusion, theoretically and practically, as to the precise meaning of each term, but also is there often as much confusion as to the existence of a pathological process to which either or both terms can be applied. * * *

Psychiatric nomenclature is undergoing revision and there is considered the possibility of discarding the terms 'psychosis' and 'neurosis' altogether in favor of a more flexible framework in keeping with our present knowledge and operational methods.

█ Judge Burger quoted Lewis Carroll's classic utterance in *Blocker:* "When *I* use a word," Humpty Dumpty said, in a rather scornful tone, "it means what *I* choose it to mean—neither more nor less." "Personality disorder" was chosen throughout this case to mean that there was no liability under the statute. The law does not assign such a meaning to that label. Section 404.1519(c) (2) (iii) of the Regulations that purports to assign such a meaning to those words is inconsistent with the statute and must, in Judge Blackmun's language, "give way" (359 F.2d at 181). We so find and determine.

The remand hearing examiner suggested in his decision that his study of the cases cited in our order of remand "has been of great help" [Tr. 223]. But the help received was obviously limited by the hearing examiner's insistence that "the only psychiatric condition of the claimant is that of a purely character disorder, or personality trait disturbance" [Tr. 224]. Acceptance of that talisman prevented intelligent consideration of the real questions of fact and law presented.

We have noted above the remand hearing examiner's insistence upon objective evidence. A meaningful study of Ditlow v. Celebrezze, D.C.Md.1963, 214 F.Supp. 532, would have taught the hearing examiner that the evaluation of psychiatric opinion based upon subjective evidence is the hallmark of cases involving mental impairments. On page 534 of 214 F. Supp., Judge Northrup noted that:

A review of the transcripts of the hearings before the Hearing Examiner and Appeals Council leaves little question that the plaintiff has major subjective complaints.

The report of the psychological examination stated:

The test data suggests that we are dealing with a man who entertains both grandiose as well as persecutory ideas. *These ideas are not prone to be clearly evident clinically.* What is more likely to appear clinically, are sporadic outbursts of aggressive behavior, verbal chiefly, mixed with some paranoid ideation. The tests indicate that this man is socially isolated, withdrawn and that this pattern is a defensive one; that is, it is an attempt to control paranoid ideas by not subjecting himself to personal relations. This man is rigid in his thinking and shows no ability to go along with or entertain anyone else's notions.

In reversing a denial of liability, Judge Northrup noted that "it may be arguable that the plaintiff's objective physical ills in the aggregate would warrant a finding of disability." He added, however, that the psychological findings must be added to the objective physical findings and that those findings, in total, "indicated serious emotional complications which tended to be expressed in terms

of physical malfunctioning." It was accordingly held that:

> If we assume that the plaintiff is not malingering—and the psychiatrist and psychologist unite in their opinion that he is not—then the medical and lay opinion indicates that the plaintiff's mental problems cause both the debilitating respiratory symptoms complained of and the paranoid frictions with fellow workers. [214 F. Supp. 535].

We have earlier directed attention to Dr. Wilcox's judgment that plaintiff's "strong need to express his hostility toward society * * * accounts more for his failure to perform at a reasonable level than does malingering per se" and his opinion that plaintiff's "efforts to appear bad or helpless are not of the sort associated with malingering but are directly associated with his desperate need to be taken care of" [Tr. 350–351]. There is no evidence to the contrary. Yet, without any factual foundation whatever, the remand hearing examiner suggests that plaintiff's difficulty is subject to the explanation that he simply lacks motivation; a matter over which the hearing examiner obviously assumes the plaintiff has control.

The remand hearing examiner would not have attempted to rationalize his decision on the basis of "motivation" if he had understood the teaching of Lippert v. Ribicoff, N.D.Cal.1963, 215 F.Supp. 28. The hearing examiner in that case attempted to deny liability on the basis of an internist's suggestion that "one sees men with no more disability than this man presents but with *proper motivation* performing very adequately." Judge MacBride noted and held that:

> The Examiner apparently relied on these statements to support a finding of *no disability.* However, the law compels that such medical evidence is more proof of disability rather than the contrary. As was stated in Ollis v. Ribicoff (W.D.N.C.1962), 208 F. Supp. 644, at 648, plaintiff's "physical and *mental* capacity to resist or adapt" to his impairments is a "proper basis for evidentiary inferences on these matters. Underwood v. Ribicoff, supra [4 Cir., 298 F.2d 850]." * * * Thus, the culminating effect of these many ailments upon plaintiff must be weighed solely on the basis of the effect upon this particular man, not upon what the effects might be on *others.* (Emphasis added by Judge MacBride). [215 F.Supp. 34].

The following portion of the concluding paragraph of the *Lippert* case is applicable to this case. It was there stated:

> The Secretary (Hearing Examiner) found that plaintiff was not prevented, by reason of his medically determinable ailments, from "continuously engaging in any form of substantial gainful activity" Record, p. 18 without any evidence suggestive of just what activity of a *substantial* and *gainful* nature is available to a man in plaintiff's condition and of his background, training, age and experience. * * * The findings of the "Secretary" are thus without foundation in fact, law, or reason, and must be reversed. (Emphasis the court's). [215 F.Supp. 34].

For the reasons stated, it is hereby

Ordered that defendant's motion for summary judgment be, and the same is hereby, denied. It is further

Ordered that plaintiff's motion for summary judgment be, and the same is hereby, granted. It is further

Ordered that this cause be, and the same is hereby, remanded to the defendant with instructions to allow plaintiff's claim.