**John DOE, Plaintiff,**

v.

**Patricia R. HARRIS, Secretary of Health and Human Services, Defendant.**

No. 79 Civ. 589 (JMC).

United States District Court, S. D. New York.

June 30, 1980.

Samuel Lorenzo, New York City, for plaintiff.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York by Nancy E. Friedman, Asst. U. S. Atty. and Borge Varmer, Regional Atty., Region II, Dept. of Health and Human Services by Marla Simpson, Asst. Regional Atty., New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motion by plaintiff, for judgment on the pleadings, is granted. Fed.R.Civ.P. 12(c).

Motion by defendant, for judgment on the pleadings, is denied. Fed.R.Civ.P. 12(c).

This matter is remanded to the Secretary for further proceedings in accordance with this Memorandum and Order. 42 U.S.C. § 405(g).

Jurisdiction is based upon the Social Security Act. *Id.*

### FACTS

There is no dispute about the facts leading up to claimant's current psychiatric condition. Claimant began working as a New York City Police Officer in 1968, when he was twenty-eight years old. Approximately two-and-a-half years later, he started to display symptoms of psychiatric disorder. Because of his fears that "others were following him, that the Mafia were plotting against him, and that there [was] a plot to murder him and make it look like an accident," he was admitted to Bellevue Hospital Psychiatric Division in January 1971, and diagnosed as suffering from "schizophrenia, paranoid type."[1] He stated at one point that he had tried to assist a woman who was having trouble with her car in a parking lot, but that she had attempted to run him over. He then concluded that the FBI had hired her to kill him.[2] After approximately one week at Bellevue, he was transferred to a different hospital, where he remained for about another month.[3] While at Bellevue, the claimant received 300 milligrams of Thorazine daily.[4]

After his discharge in early March, plaintiff continued to see a psychiatrist and receive medication as an outpatient,[5] until his psychiatrist discontinued his medication and advised him to return to duty as a police officer. The record, unfortunately, does not specify when this occurred. By later October 1971, however, he had resurrected his fear that the FBI was after him, and that "someone was going to kill him," and consequently was re-admitted to Bellevue.[6] Hospital psychiatrists again diagnosed his problem as paranoid-type schizophrenia, and resumed medication. According to one of the attending physicians, claimant suffered from "persecutory and grandiose delusions," and "[h]is affect was flat and his insight and judgment were markedly impaired."[7]

After approximately a month, claimant was transferred to Rockland State Hospital, which recorded the following: "During the first weeks he appeared to be psychotic, delusional, thinking that people from the FBI were after him in order to kill him. He was at times depressed, very scared and even sobbing."[8] Claimant's overt symptoms eventually subsided, however. A notation into his record dated January 4, 1972, states: "At the present time he doesn't appear to be overtly psychotic. He appears to be pleasant, polite and cooperative. Sensorium is clear. He has more insight into his problem and better judgment. He appears to be in good physical condition."[9] The following day he was transferred to a Veterans Administration Hospital, where he remained for another week.

Unfortunately, the record below contains no evidence of what claimant did from the

---

1. Transcript of Administrative Proceedings at 42. [The transcript of the proceedings below was filed as part of the Answer to the Complaint on June 7, 1979. Hereinafter, it will be cited as "Tr.".]

2. *Id.* at 44.

3. *Id.* at 55.

4. *Id.* at 42. Unfortunately, the record below does not contain the records of the hospital to which claimant was transferred after his stay at Bellevue in January 1971. It is therefore impossible to ascertain whether he was continued on medication.

5. *Id.* at 44.

6. *Id.* at 41.

7. *Id.*

8. *Id.* at 45.

9. *Id.*

time he was discharged from the Veterans Administration Hospital to November 1972, when he submitted his resignation from the Police Department.[10] The circumstances of that resignation, however, suggest that his psychiatric illness had not, in fact, permanently abated. Claimant wrote the following letter to his commanding officer:

> I . . . want to make it clear that my life is in danger. Certain people (namely the F.B.I. and the C.I.A. or other agents or informers) are planning to murder me. They are going to make it look like an accident, a set up or planned accident, to wipe me out.[11]

The letter then named certain people who claimant believed were members of the conspiracy against him.

In January 1973, the Police Commissioner accepted claimant's resignation. Thereafter, claimant's attorney commenced a special proceeding in the New York State Supreme Court to set aside his resignation and reinstate him so as to enable him to receive a disability pension. On the basis of claimant's past psychiatric history and the content of his resignation letter, the Supreme Court found claimant to have been of unsound mind when he resigned, and therefore declared his resignation a nullity. The court ordered the Commissioner to reinstate him for the purpose of his applying for a disability pension.[12]

The record also contains little indication of what plaintiff did from the time of his resignation to approximately November 1974, when he began receiving his disability pension from the Police Department. After he started receiving the pension, he tried to work at two different jobs. For three months, he worked as a "helper" for a furniture mover, and thereafter he drove a taxi until he killed a passenger on May 5, 1975.

The record is unfortunately sparse in details about this incident. It appears that while plaintiff was driving his taxi, an altercation developed with an eighty-year-old passenger. After the passenger left the taxi, claimant ran him down and killed him. Claimant was arrested, indicted for second degree murder, and held in the Prison Hospital of the New York City House of Detention for Men at Riker's Island awaiting trial.[13] Two psychiatrists who examined the claimant shortly after his arrest found him unfit to stand trial and in need of hospitalization.[14] One of them reported that claimant ran the victim down because he thought he was harassing and intimidating him.[15]

More than a year later, on June 22, 1976, claimant was acquitted by reason of mental disease or defect. Pursuant to section 330.-20 of the New York Criminal Procedure Law ["C.P.L."], he was then committed to the custody of the commissioner of mental hygiene.[16] Two days later, claimant was

---

10. The record is not entirely clear, but it appears that claimant continued to receive outpatient treatment from the Veterans Administration after his discharge. *See id.* at 55, 60.

11. *Id.* at 54.

12. *Id.* at 53–59.

13. *Id.* at 35.

14. *Id.* at 62–65, 65–70.

15. *Id.* at 69.

16. *Id.* at 48. Unfortunately, the record does not contain copies of the pertinent court orders.

The pertinent provisions of section 330.20 are:

    1. Upon rendition of a verdict of acquittal by reason of mental disease or defect, the court must order the defendant to be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene. The court must direct the sheriff to temporarily hold the defendant pending designation of an appropriate institution in which the defendant must be placed, and when notified by the commissioner of mental hygiene of the designated institution, the sheriff must forthwith cause the defendant to be delivered to the head of such institution. Such defendant is entitled to the assistance of the mental health information service.

    2. If the commissioner of mental hygiene is of the opinion that a person committed to his custody, pursuant to subdivision one of this section, may be discharged or released on condition without danger to himself or to others, he must make application for the dis-

admitted to the Mid-Hudson Psychiatric Center ["Mid-Hudson"].

According to a psychiatrist who first interviewed claimant at Mid-Hudson: "At the time of admission, [he] demonstrated a complete absence of psychotic symptomatology and was able to establish a very rational, meaningful dialogue with the examiner." [17] Five days later, a "team leader," who was a social worker, noted the following:

[Claimant] became quite argumentative regarding the probable length of his stay here. It would appear that his lawyer suggested the insanity plea and is telling [claimant] he'll get an independent psychiatrist to testify for his release. He minimizes the seriousness of his crime, is resentful of the turn of events, and exhibits no remorse or insight whatsoever into the enormity of the deed. He appears to be in very good contact and it is the writer's feeling that he killed the passenger, not in a "panic", but in a complete loss of control due to anger. However, he is most resentful over his incarceration, completely disregarding the fact that he thus avoided a lengthy prison term. [18]

A psychiatrist's entry into claimant's record in August 1976 states that "his functionally psychotic disorder can be regarded as being in a state of remission." [19] Nevertheless claimant remained hospitalized. Additional entries by the psychiatrist and a psychologist in February and March 1977 indicate no change in his "basic clinical condition," but note his lack of insight into his condition. [20]

In June 1977, claimant was transferred to the Manhattan Psychiatric Center ["Manhattan"]. Manhattan's records on the claimant state that at the time of his admission there, he "had no active psychotic symptoms but did show residual symptoms of ambivalence of feeling, feeling of uncertainty and distrust of others and a some-

charge or release of such person in a report to the court by which such person was committed and must transmit a copy of such application and report to the mental health information service of the judicial department in which the court is located and to the district attorney of the county from which the defendant was committed. The court may then appoint up to two qualified psychiatrists, as defined in subdivision five of section 730.10 of this chapter, to examine such person, to report within sixty days, or such longer period as the court determines to be necessary for the purpose, their opinion as to his mental condition. To facilitate such examination and the proceedings thereon, the court may cause such person to be confined in any institution located near the place where the court sits, which may hereafter be designated by the commissioner of mental hygiene as suitable for the temporary detention of irresponsible persons.

3. If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding. After such a hearing, the committed person must be discharged, released on such conditions as

the court determines to be necessary, or recommitted to the commissioner of mental hygiene. The commissioner of mental hygiene must make suitable provision for the care and supervision by the department of mental hygiene of persons released conditionally under this section.
N.Y.Crim.Proc. Law § 330.20 (McKinney 1971 & Supp.1979–1980). Although section 330.20 was amended in 1977, the amendments do not affect its application in this case.

By 1975, the New York courts had construed this statute as permitting detention of a person acquitted by reason of mental disease or defect for "only so long as shall be reasonably necessary to examine him and to report . . . findings to the court" on the question of his sanity. *People v. McNelly*, 83 Misc.2d 262, 371 N.Y.S.2d 538, 543 (Sup.Ct.N.Y.Co.1975) (relying on *People v. Lally*, 19 N.Y.2d 27, 277 N.Y. S.2d 654, 224 N.E.2d 87 (1966)); *see Lee v. Kolb*, 449 F.Supp. 1368, 1379–80 (W.D.N.Y. 1978) (three-judge court) (upholding constitutionality of § 330.20, not as written, but as construed in *Lally* and *McNelly, supra*).

17. Tr. at 48.

18. *Id.* at 49.

19. *Id.* at 50.

20. *Id.* at 50–51.

what hollow affect."[21] Moreover, the general observations of the claimant were positive. He demonstrated good personal hygiene and grooming, participated well in group activities, although his "relations with others" were "not quite up to the average expected," and he planned to begin "prevocational training in air-conditioning and refrigeration."[22]

## ADMINISTRATIVE PROCEEDINGS

Claimant applied for disability benefits under section 223 of the Social Security Act, 42 U.S.C. § 423, on May 18, 1977, alleging disability from mental illness since May 5, 1975. The Social Security Administration of the Department of Health, Education and Welfare (now of the Department of Health and Human Services) denied his application on June 13, 1977, and again after reconsideration on May 8, 1978. Thereafter, the attorney who continues to represent claimant in this action, requested a hearing on claimant's behalf. He waived a personal appearance, however, and sought a decision on the basis of evidence submitted.[23]

On September 7, 1978, Administrative Law Judge ["ALJ"] Mary E. Cerbone handed down a decision finding claimant not to have been under a disability within the meaning of the Act at any time since his claimed onset date. She expressly noted the Secretary's supplemental regulation regarding mental disorders, which provides:

The evaluation of disability applications on the basis of mental disorders requires consideration of the nature and clinical manifestations of the medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work, as reflected by (1) daily activities both in the occupational and social spheres; (2) range of interest; (3) ability to take care of personal needs; and (4) ability to relate to others. This evaluation must be based on medical evidence consisting of demonstra-

ble clinical signs (medically demonstrable phenomena, apart from the individual's symptoms, which indicate specific abnormalities of behavior, affect, thought, memory, orientation, or contact with realty) and laboratory findings (including psychological tests) relevant to such issues as restriction of daily activities, constriction of interests, deterioration of personal habits (including personal hygiene), and impaired ability to relate to others.

The severity and duration of mental impairment(s) should be evaluated on the basis of reports from psychiatrists, psychologists, and hospitals, in conjunction with adequate descriptions of daily activities from these or other sources. Since confinement in an institution may occur because of legal or social requirements, confinement per se does not establish that impairment is severe. Similarly, release from an institution does not establish improvement. As always, severity and duration of impairment are determined by the medical evidence. A description of the individual's personal appearance and behavior at the time of the examination is also important to the evaluation process.

20 C.F.R., Subpart P, App. 1, § 12.00 (1979). The regulation further states that "[d]iagnosis alone is insufficient as a basis for evaluation of the severity of mental impairment(s)," and requires "clinical findings" of enumerated types of behavior, depending on the particular type of mental disorder claimed. *Id.* §§ 12.00, 12.03.

The ALJ did not discuss the specific behavioral characteristics required for a finding of schizophrenia sufficiently severe to constitute disability. She discounted claimant's forced hospitalization, however, and focused exclusively on two factors: (1) claimant's physical and mental functional capabilities, as manifested by his good grooming and personal hygiene, his participation in correspondence courses and group and workshop activities, and his planned

---

**21.** *Id.* at 71.

**22.** *Id.* at 72.

**23.** *Id.* at 25.

prevocational training; and (2) the absence of "psychotic symptomology," with his psychiatrists' concomitant diagnoses that his illness was in remission, and decision not to treat him with psychotropic drugs. She also concluded that "it must be assumed that from May 1975 to June 22, 1976, during the period of time he was in jail, he was also in remission else awaital for trail [*sic*] would have been in a mental institution."[24]

The ALJ then concluded as follows:

The evidence fails to establish that the claimant has a medically determinable, physical or mental impairment or combination thereof, which has lasted or can be expected to last for a continuous period of not less than 12 months and which is of a level of severity so as to preclude the performance of all substantial gainful activity.

Within the impairments the claimant continues to possess the residual functional capacity to engage in normal physical activity on a sustained basis.

The claimant on May 5, 1975 or shortly thereafter and continuing until the date of this decision possessed the residual functional capacity to engage in a variety of his prior work activities such as a handy man, clerical, helper for a moving company, taxi cab driver or a variety of other work activities consonant with his age and educational background.

The claimant's impairments did not prevent him from engaging in substantial gainful activity for any continuous period of at least 12 months which began on or before the date of this decision.[25]

## DISCUSSION

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides that the Secretary's findings as to any fact are conclusive and must be affirmed, if they are supported by substantial evidence. *See, e. g., Rivera v. Harris*, 623 F.2d 212, at 216 (2d Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "Where evidence has not been properly evaluated because of an erroneous view of the law, however, the determination of the Secretary will not be upheld." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

The ALJ's decision appears to stand largely on a finding that claimant's mental impairment was not sufficiently severe, in the sense that but for his confinement, he would have been capable of substantial gainful activity. Before considering the question of whether the record contains sufficient evidence to support such a finding, the Court believes it necessary to raise a question not clearly addressed below: Is confinement because of a mental impairment, irrespective of its severity, sufficient to constitute disability?

The essence of the definition of disability provided in the Act is an inability to engage in any kind of substantial gainful work which exists in the national economy, because of a medically determinable physical or mental impairment.[26] "Impairment"

---

**24.** *Id.* at 12 (Decision of ALJ at 7).

**25.** *Id.* at 13–14 (Decision of ALJ at 8–9).

**26.** The pertinent parts of the Act provide:
(1) The term "disability" means—
(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;
. . .

(2) For purposes of paragraph (1)(A)—
(A) an individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

which is not defined in the Act, can be construed according to common usage to mean any deviation from normal health.[27] To constitute disability under the Act, however, it must be one which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "Severity" is similarly undefined, but the plain wording of the Act, as well as case law, indicates that it is to be determined by whether the impairment in fact precludes substantial gainful activity, not by measurement "on an imaginary scale with calibrations ranging from 'mild' to 'severe.'" *Ber v. Celebrezze*, 332 F.2d 293, 298–99 (2d Cir. 1964); *see Lupinacci v. Mathews*, 433 F.Supp. 47, 50 (S.D.N.Y. 1977).[28]

*   *   *   *   *

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.
42 U.S.C. § 423(d)(1)(A), (2)(A), (3).

**27.** Especially with respect to psychological and emotional conditions, little is to be gained by attempting to decide which are impairments and which are not, since, for the purpose of determining disability, the important inquiry is not whether the impairment exists, but whether it is of sufficient duration, and whether it prevents substantial gainful activity. *See, e. g., Griffis v. Weinberger*, 509 F.2d 837, 838 (9th Cir. 1975) (finding alcoholism an impairment); *Branham v. Gardner*, 383 F.2d 614 (6th Cir. 1967) (psychoneurosis, anxiety reaction); *Marion v. Gardner*, 359 F.2d 175 (8th Cir. 1966) (sexually deviant tendencies); *Flam v. Califano*, 469 F.Supp. 793 (E.D.N.Y.1979) (exhibitionism). *But cf. Laffoon v. Califano*, 558 F.2d 253, 256 n.7 (5th Cir. 1977) ("cultural deprivation" not a "medical impairment").

**28.** Compare the Eighth Circuit's "three-fold requirement for the determination of disability":
1. a medically determined physical or mental impairment which has or will last at least 12 months,
2. inability to engage in any substantial gainful activity, and
3. the inability must be by reason of the impairment.
*Dressel v. Califano*, 558 F.2d 504, 506–07 (8th Cir. 1977); *accord, Pierce v. Gardner*, 388 F.2d 846, 847–48 (7th Cir. 1967).

■ Thus, it would appear that if a claimant has a demonstrable psychological abnormality which causes his confinement, and if such confinement prevents substantial gainful activity, then he has an "impairment" that is "of such severity" that he is "disabled." *See Marion v. Gardner*, 359 F.2d 175, 181 (8th Cir. 1966). It does not follow, however, that all persons involuntarily confined on an asserted ground of mental impairment are disabled.[29] In the first place, the Secretary may be able to show substantial gainful activity that even a person confined could perform.[30] Additionally, the Secretary may be able to show, notwithstanding the asserted reason for confinement, either that no impairment exists or that an impairment is not the real cause for confinement.[31]

**29.** *See, e. g., Marion v. Gardner, supra*, 359 F.2d at 182.

**30.** *Cf. Doody v. Mathews*, [1976–1978 Transfer Binder] CCH Unemp. Ins. Rep. ¶ 15,275 (N.D. Ill.1976), aff'd mem., 558 F.2d 1034 (7th Cir. 1977) (claimant employed as custodian in high school while resident at "half-way house" pursuant to conditional release from court-ordered commitment).

**31.** For example, in *Pierce v. Gardner*, 388 F.2d 846 (7th Cir. 1967), a divided panel of the Court of Appeals for the Seventh Circuit found an involuntarily committed "sexually dangerous person" not to be "disabled" within the meaning of the Act. The crucial facts appear to be that the claimant had been first convicted of rape and sentenced to a ten-year maximum term of imprisonment, and thereafter confined in the psychiatric division of the state penitentiary, pursuant to an Illinois statute which permitted such confinement of any convict:

not mentally ill or mentally retarded, suffering from a mental disorder coupled with criminal propensities to the commission of sex offenses, and who has demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children.

*Id.* at 847 (quoting Ill.Rev.Stat.1965, ch. 108, § 112). The Seventh Circuit expressly distinguished *Marion, supra*, by noting that the claimant in *Marion* had been "confined not for a criminal offense but for mental illness coupled with an utter lack of power to control his sexual impulses," whereas the claimant in *Pierce* had been "confined for a criminal offense." 388 F.2d at 848.

Similarly, in *Foreman v. Weinberger*, [1975–1976 Transfer Binder] CCH Unemp. Ins. Rep.

The defendant argues that confinement is irrelevant to a determination of disability under the Act, on the theory that "[a] claimant must be able to prove that he would be unable to work if released, i. e., that his inability to work is due to physical impairments, not his incarceration."[32] To be sure, there are cases that support this proposition. In *Bertram v. Secretary of HEW*, 385 F.Supp. 755 (E.D.Wis.1974), the court questioned the holding in *Marion, supra*, and stated:

> The mere fact that an individual is incarcerated for a crime or treatment does not establish his entitlement to disability benefits under the Act. A claimant must be able to prove that he would be unable to work if released. Plaintiff must establish that his inability to engage in substantial gainful employment is caused by his mental impairment rather than by his confinement by reason of mental impairment.

385 F.Supp. at 758 (citations omitted). *Accord, Nichols v. Secretary of HEW*, 436 F.Supp. 1340 (E.D.Wis.1977).

Respectfully, this Court disagrees with and declines to follow *Bertram*. In all of the cases cited as support for the position therein, the claimants' confinement had been predicated upon prior criminal convictions.[33] Prior criminal conviction was also the basis for claimant's confinement in *Nichols*.[34] These cases are therefore consistent with this Court's view that a claimant is not disabled where the real cause of his confinement is other than an impairment. They do not, however, in this Court's opinion, justify placing a burden upon a claimant confined *solely* by reason

---

¶ 14,155 (S.D.N.Y.1975), the claimant had been admitted to Bellevue Psychiatric Hospital following a manslaughter conviction. Upon release from Bellevue, he remained confined in state prisons. Judge Werker of this district upheld the Secretary's denial of benefits, finding substantial evidence to support the Secretary's finding that "the incarceration for criminal activity was the proximate cause of this claimant's failure to work over an extended period of time." *Id.* at 2279.

**32.** Defendant's Memorandum of Law at 15 (filed Sept. 10, 1979). The Court presumes that defendant's failure to include mental impairments was inadvertent.

**33.** *Pierce v. Gardner, supra; Lang v. Secretary of HEW*, 348 F.Supp. 33 (D.Md.1972); *Waldron v. Secretary of HEW*, 344 F.Supp. 1176 (D.Md. 1972); *Hunter v. Secretary of HEW*, 329 F.Supp. 43 (E.D.Pa.1971).

In *Hunter*, claimant had been convicted of attempted burglary and sentenced to five to fifteen years' imprisonment. Although he had awaited trial in a psychiatric facility, the opinion of the Court indicates that he served his sentence in state correctional institutes. The Court held that although he had demonstrated a mental impairment, he had not shown "that his mental impairment rendered him incapable of engaging in substantial employment." 329 F.Supp. at 46.

In both *Waldron* and *Lang*, the claimants had been confined—the Court alternatively used the term "incarcerated"—after conviction and sentencing, in "a medium security institution established for the treatment of recidivists whose criminal activities are occasioned, at least in part, by mental disorders." *Lang, supra*, 348 F.Supp. at 34; *Waldron, supra*, 344

F.Supp. at 1177. Moreover, their confinement was pursuant to a statute permitting such treatment of

> an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment.

*Lang, supra*, 348 F.Supp. at 35 (quoting Md. Ann.Code, art. 31B, § 5 (1971 Repl. Vol.)). In both cases, the court concluded:

> There is an important difference between an impairment which results in an inability to perform the physical or mental functions necessary to engage in substantial gainful activity on the one hand and antisocial behavior which results in confinement on the other. In the latter case, it is the confinement rather than the impairment which precludes the individual from engaging in substantial gainful activity. The Act does not intend for simple incarceration to result in a finding of disability. *Pierce v. Gardner, supra* [388 F.2d] at 848; *Marion v. Gardner, supra* [359 F.2d] at 182; *Hunter v. Secretary, H. E. W.*, 284 F.Supp. 524 at 526 (E.D.Pa. 1968).

*Lang, supra*, 348 F.Supp. at 38 (quoting *Waldron, supra*, 344 F.Supp. at 1180).

**34.** Claimant in *Nichols* had been confined after his conviction for rape. 436 F.Supp. at 1341.

of mental impairment to show that he would be unable to work if released. Would such a burden be placed upon a claimant hospitalized—or quarantined—solely by reason of a physical impairment? [35]

In the instant case, the ALJ made no findings—indeed, adduced no evidence—of substantial gainful activity that the claimant could have performed even though confined. Furthermore, the ALJ appeared to accept that between the claimed onset date and the date of her decision, the claimant suffered from a mental impairment. Her characterization of it as an "emotional disorder" makes no difference, since claimant's "emotional disorder" fits the description of a "psychological abnormality demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Moreover, her finding that the condition was "in remission" only serves to support an inference that she believed that it still existed.[36]

■ The ALJ also made no finding that claimant's mental impairment was not the real reason for his confinement. The Court

recognizes that claimant's records from Mid-Hudson contain an entry, reproduced above, which suggests that his commitment resulted from a calculated plea bargain to avoid a lengthy prison term, and that he killed out of anger and not panic. The author of this entry, however, was neither a physician nor a psychologist, but a social worker, and, therefore, incompetent to make a psychiatric diagnosis. Moreover, his speculations are supported nowhere in the record below. It would be unreasonable, therefore, to accept this one entry as adequate to support a conclusion that the real reason for claimant's confinement was other than his mental impairment.

Consequently, this case must be remanded to the Secretary to give her an opportunity to adduce evidence: (1) that claimant could have performed substantial gainful activity despite confinement; (2) that he did not, during the relevant period, have a mental impairment; or (3) that mental impairment was not the real reason for his confinement.[37] In the absence of one or

---

**35.** *Cf. Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980) (reversing Secretary's denial of disability where although claimant may have possessed residual functional capacity to perform substantial gainful activity, ALJ had failed to consider that claimant's physical impairment "necessitated a medical regimen which in turn, in the opinion of [a] vocational expert, precluded him from engaging in gainful activity").

**36.** The term *remission* means the abatement of the symptoms and signs of a disorder or disease. The abatement may be partial or complete. Physicians use the expression *remission* to denote amelioration, which even if complete for the time being, does not necessarily imply permanent cure; in fact, the term carries the idea that the amelioration of the symptoms is temporary. L. Hinsie & R. J. Campbell, Psychiatric Dictionary 641 (Oxford University Press, N.Y.1960).

**37.** As to the latter two possibilities, the Court notes that under present New York law, no individual, not even one who has been acquitted of a crime by reason of mental disease or defect, may be confined in the absence of a judicial finding that he does indeed suffer from a mental disease or defect which necessitates confinement:

An individual's liberty cannot be deprived by "warehousing" him in a mental institution when he is not suffering from a mental illness

or defect and in no need of in-patient care and treatment on a ground which amounts to a presumption of a dangerous propensity flowing from . . . an isolated, albeit tragic, incident occurring years ago.

*In re Torsney*, 47 N.Y.2d 667, 682–83, 420 N.Y. S.2d 192, 201, 394 N.E.2d 262, 271 (1979) (plurality opinion of three Judges). Judge Meyer, concurring agreed that "dangerousness alone is an insufficient basis for involuntary commitment." *Id.* at 685, 420 N.Y.S.2d at 203, 394 N.E.2d at 273.

While the reasoning of the plurality and concurring opinions in *Torsney* appear to suggest that this had been the law in New York for some time, this Court cannot ignore that the Appellate Division in that very case had stated that under section 330.20 of the New York Criminal Procedure Law, *see* note 16 *supra*, a finding of mental illness was not a prerequisite for confinement: "A dangerous detainee will be confined even if not mentally ill or in need of immediate treatment, under CPL 330.20." *In re Torsney*, 66 A.D.2d 281, 288 n.6, 412 N.Y. S.2d 914, 918 n.6 (2d Dep't), *rev'd*, 47 N.Y.2d 667, 420 N.Y.S.2d 192, 394 N.Y.S.2d 262 (1979). There would appear to be at least some question, therefore, whether the reason for the claimant's confinement in the instant case was a mental impairment requiring confinement, or whether it was based *solely* upon a determination of "dangerousness."

more of such findings, the Secretary may not deny claimant's disability.

■ Since there are likely to be further administrative proceedings in this case, some additional discussion of the Secretary's findings is warranted. In reaching the conclusion that the claimant was not disabled within the meaning of the Act, the ALJ made several findings that are unsupported by substantial evidence. Her inference that claimant's disorder was in remission from May 1975 through June 22, 1976, was based upon information provided by claimant's attorney that claimant was in jail at the time.[38] The Social Security Administration representative who interviewed claimant, however, recorded claimant's assertion that for the entire fourteen months, he was in the prison hospital.[39] Since the two statements are not contradictory, there is no evidence that claimant was in the general population at the jail, and not, as he says, in the hospital. Hence, the inference that his impairment was in remission at the time is unsupported by substantial evidence.

Additionally, the physical and mental tasks claimant could perform while hospitalized do not support the inference that he "continue[d] to possess the residual functional capacity to engage in normal physical activity on a sustained basis," unless "normal" is read to include close and continuous supervision. *See Marion v. Gardner*, 359 F.2d 175, 181 (8th Cir. 1966). Nor is there a shred of evidence in the record to indicate that claimant could, with safety to himself and others, perform the duties of a "handy man," clerical worker, helper for a moving company, or any other job which would require contact with the general public. And the thought that he might so soon get behind a taxicab wheel again is somewhat unnerving.[40]

The ALJ also noted the Secretary's supplemental regulation regarding mental disorders, 20 C.F.R., Subpart P, App. 1, § 12.00 (1979), although she did not expressly discuss the behavioral prerequisites to a finding of disability. This regulation does not, however, appear to be inconsistent with a finding of disability in this case. Although it requires medical and clinical evidence of specific kinds of behavior, it does not suggest that such behavior must be manifest throughout the period of claimed disability. In fact, although the regulation advises that duration of mental disorder be determined by medical evidence, it contains no guidelines of how long a symptom-free period is needed before a disorder may be presumed to have sufficiently abated so that it is no longer disabling.

In this action, there is ample evidence in the record that the claimant manifested "persistent hallucinations or delusions" with "resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people." 20 C.F.R., Subpart P, App. 1, § 12.03(A)(4), (B) (1979) (setting out requirements for schizophrenia). While it is true that observations of such behavior date only from before his claimed onset date, the record contains little unequivocal evidence that his impairment ever subsided sufficiently thereafter to render him capable of substantial gainful activity. Moreover, the duration of his apparent remission can be evaluated only in light of his similarly symptom-free intervals between his previous hospitalizations.

## CONCLUSION

This action is remanded to the Secretary so that she can either award benefits or seek additional proof as described herein. 42 U.S.C. § 405(g).

The Clerk of the Court is directed to prepare and enter Judgment on the pleadings, Fed.R.Civ.P. 12(c), remanding this ac-

---

**38.** Tr. at 74.

**39.** *Id.* at 35.

**40.** There is an indication in the records furnished by Mid-Hudson that claimant's driver's license had been revoked. *Id.* at 50–51. This was probably done pursuant to N.Y.Veh. & Traf.Law § 510(3)(b) (McKinney 1970 & Supp. 1979–1980).

tion to the Secretary, and terminating this proceeding.

SO ORDERED.