**Yvonne CULVER, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education, and Welfare, Defendant.**

**No. Civ–77–571.**

United States District Court, W. D. New York.

Dec. 12, 1980.

Montemaggi & Wallen, Rochester, N. Y. (Lewis F. Montemaggi, Rochester, N. Y., of counsel), for plaintiff.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Matthew J. Murphy III, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

This is an action brought under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff Yvonne Culver is a former assembly worker at Harrison Radiator Division of General Motors Corporation. At the time of her complaint, she was 38 years old, divorced, and living with her two children, then ages 17 and 20.

On February 26, 1975, after working at Harrison Radiator since 1965, she fell off a stool at work. She began experiencing pain several days later in early March and has not worked since then. She claims a period of disability from March 8, 1975, to at least January 19, 1977. Although she has had bruises and pain from the fall and ultimately underwent an operation for a diaphragmatic hernia, her major claim is not based on her physical ailments but on a psychological impairment allegedly brought on by the fall. The primary disabling condition claimed then is psychoneurosis, conversion type, and psychotic depression, with periods of remission.

In order to establish that Ms. Culver has a "disability" within the terms of the Act, she has the burden of showing that she is unable to engage in any substantial gainful employment "by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." Social Security Act, § 223(d)(1).

The Administrative Law Judge [ALJ] conducted a hearing on November 2, 1976, plaintiff having earlier exhausted her other administrative appeals. On January 19, 1977, the ALJ issued an opinion denying plaintiff benefits. The ALJ's opinion became the final decision of the Secretary on April 21, 1977. A complaint was filed in this court on October 25, 1977. The government filed its responsive papers, including a brief, by June 4, 1978. There having been no action in this case for six months, on January 4, 1979, the court, *sua sponte*, issued an order to show cause why the claim should not be dismissed for failure to prosecute. Upon a showing by the parties, the order was withdrawn on April 16, 1979. Motions for summary judgment and briefs were filed by October, 1979. Oral argument took place December 19, 1979; the case was submitted in January, 1980.

The ALJ concluded that there was no basis for granting benefits based on her physical disability claim, as her physical problems did not prevent her from working for a period of 12 consecutive months. The ALJ further concluded that the claimant's subjective complaints were not sufficiently credible to serve as a basis for a finding of disability. Court Transcript Index, filed February 28, 1978, at 48 (hereinafter "Transcript").

Plaintiff contends that she was disabled for more than the requisite consecutive 12–month period by the combined effects of her physical and mental ills. She contends that the ALJ employed an improper legal standard in making his determination. Specifically, she contends that he relied on the absence of objective physical symptoms in order to deny her claim.

## LAW

■ The law in this area is clear that objective evidence is not essential to a finding of inability to perform substantial gainful employment. This kind of case calls for a careful examination of plaintiff's credibility with respect to her subjective complaints. In this regard, it is clear that subjective symptoms such as pain or severe discomfort may well serve as the basis for establishing disability even if such subjective symptoms are completely unaccompanied by positive clinical findings or other "objective" medical evidence. *Ber v. Celebrezze*, 332 F.2d 293 (2d Cir. 1964); *Doe v. Harris*, 495 F.Supp. 1161 (S.D.N.Y.1980). In addition, the ALJ may not reject plaintiff's claims on the ground that objective clinical findings do not establish cause for such intense subjective symptoms. *Marcus v. Califano*, 615 F.2d 23 at 27 (2d Cir. 1979). On the other hand, the ALJ may weigh the objective medical evidence, along with plaintiff's demeanor and other indicia of credibility, in deciding whether to credit her claimed subjective symptoms. *Marcus, id.* In this case, a careful review of the numerous medical reports convinces the court that the ALJ placed "undue emphasis" on the lack of objective medical findings. *See generally Branham v. Gardner*, 383 F.2d 614 (6th Cir. 1967); *Cutler v. Weinberger*, 516 F.2d 1282 (2d Cir. 1975).

It is necessary to set out in some detail the plaintiff's medical record in order to explain how the court has reached this conclusion, particularly in light of plaintiff's need to show a 12–month period of disability.

## FACTS

Although most of the evidence presented to the ALJ at the hearing concerning plaintiff's medical condition stems from the period beginning after February 26, 1975, the day on which she fell at Harrison Radiator, plaintiff's psychological problems were documented long before. As early as 1969, Dr. Harold J. Levy, a psychiatrist, had seen the plaintiff as a patient in consultation and concluded that she was suffering from a "severe and neurotic disorder with masochism," which required further psychotherapy. Transcript at 176. Although this information properly has no bearing on the ALJ's conclusion as to the plaintiff's ability to perform substantial gainful employment during the period in question, it is relevant information with respect to his determination of plaintiff's credibility as to her subjective complaints. It is certainly most unlikely that someone in plaintiff's position would, in effect, attempt to make a record six years in advance of her claim.

The other medical evidence before the ALJ all relates to the period after the physical injury. I will discuss it chronologically.

The medical reports concerning plaintiff's injuries which were written immediately after her fall leave no doubt but that she was unable to perform any work in that immediate period. Two days after plaintiff stopped going to work, she saw Dr. Louis A. Scinta, M.D. After repeated treatments, his "objective findings" were that plaintiff had severe bruises of the chest with pain in breathing as well as an injured right hip, giving patient a sciatic pain. He concluded that plaintiff was unable to work from March 8, 1975, when she stopped working. Dr. Scinta anticipated plaintiff could return to work on March 24, 1975. Transcript at 228. Dr. Scinta also referred plaintiff to Dr. Denzel, an orthopedic surgeon. Transcript at 229.

Plaintiff saw Dr. Wayne P. Fricke, an orthopedic surgeon who is an associate of Dr. Denzel, three times between March 19 and April 2, 1975. Dr. Fricke concluded that there was considerable muscle injury which was probably related to her work injury. In addition, Dr. Fricke concluded that there was a significant amount of functional overlay in the production of "bizarre symptoms and physical findings." He determined that she was unable to work beginning March 10, 1975, and estimated that she would remain unable to work until April 23, 1975. Transcript at 230–33.

Plaintiff was subsequently examined by Dr. Robert D. Phelps, D.O. He examined her regularly two to three times a week

from April 2 to July 25, 1975. Transcript at 223–27. His conclusion was that plaintiff was suffering from spasms of muscles in her back, neck, and hip area. His examination, which was performed for the New York State Workmen's Compensation Board, also drew him to the conclusion that patient was suffering a mild psychoneurosis, hysteria, as well as physical findings and complaints, probably due to hysteria. Transcript at 225. Plaintiff saw Dr. Phelps on at least 13 separate occasions for treatment. During this period, Dr. Phelps concluded that the patient was totally disabled and unable to continue with her regular work. Transcript at 224. Dr. Phelps also referred her to Dr. Robert Goldstein, a psychiatrist.

During the period in which Ms. Culver was being treated by Dr. Phelps, she was also hospitalized from April 28 to April 30 for treatment of interstitial cystitis, urethral stricture, and exudative trigonitis. Transcript at 236. The attending physician, Dr. Victor Lazarus, M.D., concluded that her "neurologic status" was not caused by her injury but that her symptoms "may have been temporarily aggrevated [sic] as a result of the fall." On the other hand, Dr. Lazarus went on to say, "The findings are not felt to be any worse than they were prior to her reported injury." Transcript at 237.

While hospitalized, the plaintiff was also examined by Dr. William Kinkel, a neurologist. His diagnosis appears as part of a letter to Dr. Phelps which, unfortunately, is all but illegible. Transcript at 239–41. It would appear that Dr. Kinkel determined that the plaintiff was in need of psychiatric help in the event that her symptoms continued. He indicates that many of her symptoms were "histrionic" and the result of a "rather florid hysteria." Transcript at 241.

Also during the period in which she was under treatment by Dr. Phelps, the plaintiff saw Dr. Robert Goldstein, a psychiatrist. Dr. Goldstein saw the plaintiff on seven occasions between May 11 and July 17, 1975. He diagnosed her as having psychoneurosis, hysterical reaction, conversion

type with depressive features, but that her basic psychological problem was not the result of her fall at work. He concluded that plaintiff was unable to work from March 6 to June 16, 1975, and that she was likely to have periods of remissions and exacerbations of her psychological problems in the future. He indicated that these conditions would frequently take the form of a wide variety of somatic conditions without any clear-cut physical basis. Transcript at 254, 275 78.

On another occasion during the same period, the plaintiff was examined by Dr. Mohammed S. Megahed, a neurologist. Transcript at 255. Dr. Megahed examined plaintiff in the emergency room at St. Mary's Hospital in Buffalo on July 22, 1975. Dr. Megahed reported that plaintiff complained of a strange sensation in the head, particularly in the left side, with difficulty in walking. In addition, she indicated to him that she had experienced several dizzy spells and light-headedness. Although Dr. Megahed determined that the plaintiff was alert and oriented, he also concluded that she laughed for no reason and had symptoms suggestive of a severe functional overlay. His conclusion was that plaintiff had a conversion reaction with marked functional overlay. He gave her what in effect was a placebo, and despite the fact that she had entered the emergency room on crutches, not able to walk, she left without crutches and without any sensory disturbances. Transcript at 255.

The next physician to see the plaintiff was Dr. John F. McGowan, M.D. He gave the plaintiff a neurological and psychiatric examination on July 26, 1975. He found no abnormality on pinprick testing, no segmental pattern or localization, and no evidence of cerebellar deficit in coordination testing. In addition, he determined that the plaintiff showed no evidence of overt anxiety, no tremor, no excessive perspiration or dilation of the pupils. Nonetheless, Dr. McGowan determined that the plaintiff has a "history of previous psychoneurosis, conversion reaction, now in remission at the present time." Transcript at 245. Dr. McGowan noted

that, "None of these conditions are [sic] in relationship to the accident of 2/26/75. I feel that these conditions also have not been aggravated by the accident of record." In addition, Dr. McGowan stated: "she is fully recovered from whatever soft tissue injuries were incurred as a result of the accident . . . ."

Plaintiff's next hospitalization took place on August 1 and continued through to August 26, 1975. She was confined in the Niagara Falls Memorial Medical Center. While there, she was under the care of Dr. Myron H. Marshall, M.D., a psychiatrist. When first admitted to the Medical Center, the plaintiff was also examined by Dr. D. Cooper. Transcript at 185. This apparently initial intake interview and examination led Dr. Cooper to conclude that the patient was in no distress whatever. On the other hand, Dr. Cooper did recommend that a psychiatric interview should proceed.

Dr. Marshall reported that the patient complained of dizziness and fainting brought on by emotional upset. Transcript at 182. Dr. Marshall observed that the plaintiff was oriented, alert, and coherent. She was not hallucinating or delusional. He concluded that she had a "depressive reaction" but ruled out organic illness. Transcript at 183.

While in the Niagara Falls Memorial Medical Center, plaintiff was also examined by Dr. Kaunitz. He conducted a physical examination and concluded that she was normal except for moderate sub-xiphoid abdominal tenderness. No other organic diseases were diagnosed. He concluded that she was discharged improved and that her prognosis was "fair." Transcript at 184.

Plaintiff also had a number of other medical examinations while she was at the Niagara Falls Memorial Center, e. g., Dr. Kirby, Transcript at 192-95; Dr. Edwin J. Manning, Transcript at 196-97. None of them revealed any significant abnormalities. In short, her physical workup was essentially normal, except for a small hernia which was surgically repaired on August 19, 1975, by Dr. Kaunitz, a thoracic surgeon.

As already indicated, her psychological diagnosis was depressive reaction. Transcript at 181. While under Dr. Marshall's care, Ms. Culver was administered electro-shock treatments repeatedly. Transcript at 181. These treatments continued even after plaintiff was discharged, under the immediate supervision of Dr. Marshall as well as several other psychiatrists. As late as September 26, 1975, Dr. Marshall concluded that the prognosis for the patient was only "fair." He further concluded, "The patient has a difficult time relating because of problems evolving around her super ego and masked dependency needs." Transcript at 175. Even after her discharge from the Niagara Falls Memorial Medical Center, Dr. Marshall continued to treat the plaintiff on a weekly basis in his office until she was hospitalized again on December 11, 1976. During that hospitalization, Dr. Marshall, the treating physician, directed that plaintiff again receive electro-shock therapy treatments. In fact, Dr. Gerardo Juan, a specialist in psychiatry and neurology, administered a total of 17 electro-shock therapy treatments. Transcript at 212-15. Although Dr. Juan concluded that the plaintiff showed marked improvement, he also indicated that there were "significant relapses" and that she was unable to return to work at the time. He indicated that "it is unknown as to whether she will ever be able to return to work." Transcript at 215. Plaintiff's diagnosis on discharge from the hospital on January 28, 1976, was psychotic depressive reaction, early acute, purulent otitis media, secondary to acute pharyngitis. Transcript at 201. On her discharge for the second time, plaintiff continued to be seen by a psychiatrist on a weekly basis. This continued until she was hospitalized again on April 27, 1976.

Her hospitalization this time lasted until June 5, 1976. During the hospitalization, she received 13 electro-shock treatments, all under the supervision of Dr. Juan. Dr. Juan concluded as part of his final diagnosis that Ms. Culver showed gradual improvement with respect to her depression. Transcript at 203.

After her hospitalization in January, 1976, the plaintiff was seen by Dr. Harry W. Goldfarb, a psychiatrist. After an extensive examination, Dr. Goldfarb concluded that the patient was suffering from "Psychoneurotic Reaction with Depressive and Somatic Features." He observed that:

> This patient is manifestly not ready to work, but I feel that if therapy concentrates more heavily in the areas that I have outlined the prognosis could be much more hopeful than it is at present.

Transcript at 253.

Dr. Levy, who, as noted earlier, had seen the patient last in 1969, also saw the patient in early 1976. Transcript at 176. He concluded that the patient was suffering from a "Depressive Neurosis, Chronic in Type." Dr. Levy generally found the same symptoms as Dr. Goldfarb. He concluded:

> Prognosis is somewhat guarded but one must keep in mind that this woman has been able to work in spite of her depressive neurosis through the years in the past so that there is at least a moderately good chance that she will be rehabilitated by current psychotherapy.

Transcript at 177. It is significant that plaintiff saw Dr. Goldfarb at the request of Harrison Radiator and Drs. Levy and McGowan in connection with her petition for Workmen's Compensation benefits. It is not surprising, therefore, that their reports are primarily concerned with whether plaintiff's psychoneurotic ailment was the result of her fall from the stool rather than whether the ailment was sufficiently severe as to bar her from further employment.

It is on the basis of this voluminous medical record, replete with the diagnoses by numerous psychiatrists, neurologists, and osteopaths, and with the prescription and repeated administration of electro–shock treatments, that we must examine the ALJ's determination that plaintiff's claim of emotional and physical impairments sufficient to prevent her from performing substantial gainful employment for a 12–month period was not credible.

## ANALYSIS

Since it is clear that subjective symptoms can alone establish disability, it is most significant that the ALJ places such heavy reliance on the dearth of objective clinical findings. In the context of so much expert evidence of disability, the ALJ's opinion becomes highly suspicious. For example, the ALJ states:

> The claimant has undergone numerous psychiatric examinations, which have generally revealed little objective indication of any psychotic or severe neurotic disorder.

Transcript at 47.

> There have been only minimal objective findings to support a diagnosis of a severe, continuing emotional impairment. The opinions of those physicians who have reported the claimant to be disabled are based primarily upon the claimant's subjective complaints, which, as noted above, are not viewed as sufficiently credible to serve as a basis for a finding of disability.

Transcript at 48.

It is not clear whether the absence of such objective proof was merely one factor out of many taken into account in evaluating plaintiff's credibility as to the severity of her symptoms, or a consideration weighing against the very existence of an ailment. Because a very significant ambiguity exists as to whether the ALJ employed the correct legal standard, I cannot say with certainty that the ALJ's decision was based on substantial evidence.

The court's conclusion is strengthened by the fact that the plaintiff's physicians prescribed repeated electro–shock treatments. If her treating physicians were sufficiently certain of their conclusions as to prescribe such a radical and severe course of treatment, it is particularly incumbent upon the ALJ, upon rejecting the diagnosis of the treating physicians, to give reasons for his conclusions. In this case, the ALJ failed to explain his conclusions.

It is also significant that all of the psychiatrists who examined the plaintiff agree that she is mentally ill. She has also been repeatedly hospitalized for her mental condition. It is true that only Dr. Gerardo Juan diagnosed her as psychotic, while the others all apparently thought she was neurotic. It is also true, however, that virtually all of the physicians who treated her agreed that she could not perform work for various periods of time. The most optimistic psychiatrist was the Social Security Administration–certified, Dr. Harold J. Levy, who wrote that the prognosis was "somewhat guarded" but that because of plaintiff's prior work, which she managed to perform despite her depressive neurosis, "there is at least a moderately good chance that she will be rehabilitated by current psychotherapy." This is not a strong basis on which to rest a conclusion that plaintiff is not disabled.

None of the other psychiatrists reported that she could return to work. Those relied upon in the government's brief hardly add much to defendant's position. For example, Dr. John F. McGowan, whose report was prepared for the Workmen's Compensation Board, merely states that her ailment pre-existed her fall and was not exacerbated by it. This does not mean she can return to work. Similarly, Dr. Robert Goldstein did not address the question of her ability to return to work. His report essentially corroborates Dr. McGowan's. He adds, however, that she is likely to be subject to wide fluctuations in mood and behavior and that her psychoneurotic problem is not likely to change. This too does not mean that she can return to work. In fact, the possibility of wide mood and behavior changes may indicate precisely the opposite. I shall not attempt to evaluate all of the medical evidence here. However, it is clear to me that these reports, taken in conjunction with the other evidence, do not amount to substantial evidence for the ALJ's opinion that Ms. Culver can perform substantial gainful employment. ██ Since the Court of Appeals has taught us that the mere presence of subjective pain can in itself be adequate basis for a finding of disability, there is no doubt but that other subjective medical symptoms can also constitute a basis for a finding of disability. The language in the ALJ's opinion referring to the lack of objective findings to support the physician's diagnosis would seem to indicate that he was operating under a misapprehension as to the state of the law. Doctors are entitled to make their diagnoses based on subjective complaints if they believe it is justified. The plaintiff, of course, continues to have the burden of demonstrating that she is unable to perform substantial gainful employment for a 12-month period. However, where there has been a long course of disability, repeated hospital treatment, repeated medical findings that the plaintiff is disabled and cannot work, and the administration of repeated radical treatment such as electroshock therapy, it is incumbent upon the ALJ to explain in detail the reasons for not crediting the plaintiff. The ALJ in such a case must also take every precaution to avoid substituting his layman's judgment for the diagnosis of trained physicians. While it is true that the opinions of those physicians who reported the claimant to be disabled were based primarily upon the claimant's subjective complaints as was pointed out by the ALJ, it is also true that those physicians had observed the plaintiff over extended periods of time and over many years' duration. Very carefully drawn conclusions by experienced clinicians cannot be brushed aside by the simple assertion that they were based on "only minimal objective findings."

██ Although this Social Security case is quite old and the plaintiff has made out a strong case, I am compelled by the record to remand it to the Secretary for yet another hearing. At that time, the plaintiff may put in any additional evidence concerning her condition so that the ALJ may consider it as well.

So ordered.